Commonwealth *v.* Davis, Appellant.

Argued March 17, 1958; reargued March 16, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

reargument refused July 2, 1959.

*H. H. Heilman, Jr.,* with him *Floy C. Jones, Jr.,* for appellant.

*Samuel Strauss,* Special Assistant District Attorney, with him *Robert E. Ashe,* former District Attorney, and *Harry A. Heilman, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 8, 1959:

We are herein presented with an appeal from a judgment of sentence upon defendant of the death penalty after his conviction of murder in the first degree.

On January 30, 1957 between 10:00 and 10:15 p.m. the victim, Emily Foster, left a bingo game in Vandergrift, Pa., to return to her home in Leechburg, Pa.— a distance of approximately five miles—and arrived there approximately fifteen minutes later. The defendant had followed her for some distance.[1] Mrs. Foster had placed her car in the garage and closed the garage door when she was hit on the head several times with a blunt instrument. These blows caused a fracture of her skull, rendered her unconscious and caused

---

[1] The evidence is viewed in the light most favorable to the Commonwealth: *Commonwealth v. Gates,* 392 Pa. 557, 141 A. 2d 219.

almost instantaneous death. The victim's body was discovered by her husband at about 11:05 p.m. when the latter returned from a bowling alley. The victim's purse, containing money, bingo items and other articles, was missing. The defendant left the scene of the crime by automobile, presumably to return to his home in Pittsburgh, and on the way disposed of the victim's purse and other items.

On March 18, 1957, while in the custody of Allegheny County authorities as a suspect in the commission of other crimes, the defendant admitted the attack upon Mrs. Foster and on the following day re-enacted the crime in the presence of state policemen. He signed a written statement which described in detail his activities and indicated whereat he had disposed of various possessions of the victim. The day subsequent to the crime these articles were found at or near the places indicated in defendant's written statement. At trial the defendant repudiated his written statement, denied that he had been in Leechburg at the time of the crime and denied that he had attacked the victim.

Defendant's present contentions are: (1) that the verdict was contrary to the evidence and the weight of the evidence; (2) that certain photographs of the victim and her clothing were improperly admitted in evidence; (3) that the court below erred in admitting into evidence records of prior convictions of the defendant. More important, however, than these contentions is one which was not raised upon this appeal but which was raised by us at oral argument—whether the conduct of the prosecuting attorney in his cross-examination of the defendant so seriously prejudiced the defendant to the extent that he was deprived of a fair trial.

At the conclusion of the Commonwealth's case the records of defendant's prior convictions were admitted in evidence "for the sole purpose of assisting the jury in determining the penalty to be inflicted in the event of a finding of murder in the first degree."[2] The admissibility of such evidence has been long recognized but *only for that very restricted and limited purpose*: *Commonwealth v. Thompson,* 389 Pa. 382, 133 A. 2d 207 and cases therein cited.

After the defendant concluded his case during which he had taken the stand to testify, records of prior convictions were again offered by the Commonwealth and admitted in evidence "for the specific purpose of affecting the credibility" of the defendant.[3] Such evidence was likewise admissible but *only for that very restricted and limited purpose*: *Commonwealth v. Yeager,* 329 Pa. 81, 90, 196 A. 827; *Commonwealth v. Williams,* 307 Pa. 134, 149, 160 A. 602; *Commonwealth v. Quaranta,* 295 Pa. 264, 272, 273, 145 A. 89; *Commonwealth v. Dorst,* 285 Pa. 232, 238, 132 A. 168.

The Act of March 15, 1911, P. L. 20, 19 PS §711, imposes strict limitations upon the right to cross-examine a defendant in a criminal case concerning his commission or conviction of any offense other than that offense for which he is presently being tried. Instances wherein a prosecuting attorney has been permitted to question a defendant concerning previous arrests or convictions for crimes unconnected with the crime charged in the indictment are clearly inapposite to the instant factual situation: Cf. *Commonwealth v. Dillard,*

---

[2] There were two such records: (1) a plea of guilty entered March 28, 1950 to a charge of burglary; (2) a plea of guilty entered the same date to a charge of armed robbery.

[3] At that time the Commonwealth offered in addition to the two records enumerated in footnote 2, supra, the record of a prior conviction on a charge of larceny in West Virginia.

313 Pa. 420, 422, 169 A. 138; *Commonwealth v. Flood,* 302 Pa. 190, 194, 153 A. 152. Unless the Act of 1911, supra, is to be rendered entirely nugatory the utilization by the Commonwealth of prior convictions of a defendant in a homicide case must be strictly and rigidly confined within the limits previously indicated by this Court.

The instant prosecuting attorney—not satisfied with the introduction of prior convictions to aid in fixing the penalty and determining credibility—in the course of his cross-examination of the defendant persisted in making frequent and repeated references to the defendant's criminal record and penitentiary experiences.[4] These continuous and persistent references

---

[4]"Q. Well, you have been in the penitentiary before; hadn't you? You had served time in the penitentiary? . . . Q. Well, if you got from four to eight years for an armed robbery and a burglary, what did you think you were going to get for murder? . . . Q. You robbed a woman that time, didn't you? . . . Q. Of a woman, of a purse? . . . Q. You didn't know that, and you spent four years in the Western Penitentiary? . . . Q. Well they do a lot of talking among the prisoners? . . . Q. Did you take up grammar while you were in the penitentiary? A. Did I take up grammar? Q. Did you study English while you were in the penitentiary? . . . Q. Now he questioned you, didn't he, about other matters? . . . Q. He questioned you about some murders in Pittsburgh; didn't he; Mr. McInerney? . . . *By Mr. Strauss:* If the Court please, I am prepared to state that there was no connection between this man and any of the murders in Pittsburgh about which he was questioned. There was no connection, and I don't mean to imply that there was. The point the Commonwealth proposes to show here is this; that this man was questioned about crimes that these men were primarily interested in showing, and in determining whether or not some of the cases in Pittsburgh— . . . *By Mr. Strauss:* If the Court please, at this time I would like to ask this officer whether or not this defendant was charged with any homicide, or is under any homicide charge in Allegheny County about which he questioned him. The information I have is that he not only is not charged with any homicide in Allegheny County but he is not suspected

during cross-examination to defendant's past cannot be justified on any "credibility attack" theory. The prosecuting attorney's cross-examination served as a convenient sounding board upon which was echoed and re-echoed the fact that defendant had a criminal record and could not have failed to create a prejudice against defendant in the minds of the jury. If this type of cross-examination is to be condoned and to receive the imprimatur of approval by this Court, neither the clear mandate of the Act of 1911, supra, nor the rigid limitations long and consistently imposed by this Court upon the use in homicide cases of records of a defendant's prior convictions have any practical significance. The frequent and persistent references to defendant's past made such past a vital factor in determining defendant's guilt. We have two alternatives: either to approve this type of cross-examination and thus ignore the Act of 1911 and the many pronouncements of this Court on the subject of the use of records of prior convictions or to disapprove such cross-examination and adhere both to the letter and spirit of the Act of 1911 and our previous decisions. The latter alternative must be adopted.

Our disapproval of this type of cross-examination indicates no sympathy for this defendant; it is simply a recognition of the right under the law of every person, including this defendant, to a fair and an impartial trial, a trial wherein his guilt or innocence of the offense whereof he stands charged is not determined by his past conduct or record.

From time immemorial under our jurisprudence, a person's guilt or innocence of a crime has been determined on the facts surrounding that particular crime

---

in any homicide in Allegheny County at this time, and that he was cleared as a result of his interrogation and examination of any such crime in Allegheny County."

and not on the basis of other crimes which he has committed. Adherence to this basic concept of our criminal jurisprudence dictates our present decision.

In view of our conclusion it is unnecessary to pass upon defendant's other contentions.

Judgment of sentence reversed and a new trial granted.

———

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

I rejoice in this Court's rehabilitation of the Act of March 15, 1911, P. L. 20. It was about time. The Act very specifically declares: "Hereafter any person charged with any crime, and called as a witness in his own behalf, shall not be asked, and, if asked, shall not be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation; unless,—One, He shall have at such trial, personally or by his advocate, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character, or reputation; or, Two, He shall have testified at such trial against a co-defendant, charged with the same offense."

In spite of this prohibition, as clearly spoken as angels trumpeting from mountain tops, this Court has affirmed conviction after conviction where the prosecuting attorney treated the Act of 1911 as if it were written in disappearing ink on non-existent paper.

Prosecuting attorneys were encouraged in this defiant procedure because this Court, in an incomprehen-

sible mis-reading of the Act of May 14, 1925,* practically nullified the Act of 1911. The act of 1925 which, for the first time in Pennsylvania, introduced a substitute for the death penalty in first degree murder convictions, reads: "Every person convicted of the crime of murder of the first degree shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict."

Here again the angels spoke from the summit of a mountain range and here again this Court put on ear mufflers. Chief Justice VON MOSCHZISKER, in the case of *Commonwealth v. Parker*, 294 Pa. 144, said that the Legislature, by the Act of 1925, intended to give the jury the authority to consider the whole history of a defendant charged with murder and, in rendering a verdict, decide, in the event a first degree murder verdict was reached, whether the defendant should suffer death or life imprisonment. If the print in the Act of 1925 were placed under a battery of conflicting lights, the resulting shadows could never possibly be interpreted to read what Chief Justice VON MOSCHZISKER read into it. Under the interpretation of Chief Justice VON MOSCHZISKER, the jury became a conclave of St. Peters to pass upon every sin, every crime, every peccadillo of the accused, and, from the aggregate, decide whether he should be doomed to an ignominious eternity by a shameful death in the electric chair. Under this interpretation the jury was allowed, and has been allowed ever since, to pass upon offenses not in the remotest manner, associated by subject, time, or geography with the particular offense for which the defendant was being tried.

---

* This statute was re-enacted in 1939 (Act of June 24, 1939. P. L. 872, §701).

In the case of *Commonwealth v. Kurutz,* 312 Pa. 343, Chief Justice KEPHART carried the Act of 1925 into further shadows of misinterpretation; and then, Chief Justice MAXEY, in the case of *Commonwealth v. De-Pofi,* 362 Pa. 229, made a complete shambles of the words of the General Assembly. It would be difficult to find an opinion more peppered with illogicalities, non sequiturs, and casuistries than those found in the Majority Opinion in the *DePofi* case.

In *Commonwealth v. Thompson,* 389 Pa. 382, I discuss at length my views on the Act of 1925 and the manner in which it has been misapplied by this Court to defy the obvious intent of the Legislature, to upset the simplest rules of logic, to contradict rudimentary principles of common sense; and thus to permit a conviction which might otherwise not have been attained. I incorporate, by reference, my Dissenting Opinion in that case, into this opinion.

I trust that it may now not be long until this Court applies to the Act of 1925 the same pulmotor with which it has today resuscitated the expressed will of the sovereign power of the Commonwealth in the Act of 1911.

———

CONCURRING OPINION BY MR. JUSTICE MCBRIDE:

I concur in the reversal of this judgment. I do not, however, believe that the reasons stated touch the heart of the matter. I am left with the unrelievable feeling that it is fundamentally unfair to spread before the jury a defendant's criminal record while the issue of his guilt has not yet been ascertained by them. I am aware, of course, of the decisions of this Court, which allow such a practice. Some of the justices who wrote those opinions have specifically conceded the unfairness of it. The present Chief Justice, in his dis-

sent in *Commonwealth v. DePofi,* 362 Pa. 229, 66 A. 2d 649, and Justice MUSMANNO, in his dissent in *Commonwealth v. Thompson,* 389 Pa. 382, 417, 133 A. 2d 207, and Justice BELL in *Commonwealth v. Lowry,* 374 Pa. 594, 603, 98 A. 2d 733, have placed on the record their views to the same effect. It is clear, therefore, that at least a majority of this Court believes that this procedure is unfair. It is my firm conviction that experience in the application of the rule during the years which have passed since the Act of 1925 has convincingly demonstrated that this unfair rule ought no longer be followed. It was Mr. Justice HOLMES who opened his classic work on the Common Law by telling us: "The object of this book is to present a general view of the Common Law. To accomplish the task, other tools are needed besides logic. It is something to show that the consistency of a system requires a particular result, but it is not all. The life of the law has not been logic: it has been experience."

That statement can have no better application than it has here. Even as a matter of logic the rule has been supported on the ground that the jury ought to know just what the judge ought to know in pronouncing sentence; but it must be remembered that upon conviction of murder in the first degree prior to 1925 there was no discretion on the part of a judge to impose a punishment less than death. It did not matter how much or how little he knew of the defendant. Even judges, hearing a plea of guilty, should not know a man's criminal record until they have first determined the degree of his guilt. Only then, if ever, can that criminal record play its *proper* part on the question of sentence without the necessarily attendant uncertainty as to whether it plays an *improper* part on the issue of guilt or innocence. It was this Court which created that rule only 34 years ago; it is this Court which should

now abandon it. Stare decisis is one of the great principles of jurisprudence but its application here would be unjust. I join with Justice MUSMANNO in his concurring opinion.

· It seems to me that there is an additional reason for reversing the judgment. It was apparently not argued in the court below and was not presented to us; but in my view, it is too fundamental to be disregarded. *Commonwealth v. Stowers*, 363 Pa. 435, 70 A. 2d 226 (1950).

The Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701,[1] is the governing substantive and procedural statute. The respective functions of the court and jury are carefully stated therein. Where the defendant pleads not guilty it becomes the duty of the jury trying the case not only to find the degree of the offense

---

[1] The statute reads as follows: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree. The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether the person is guilty of murder of the first or second degree. If such person is convicted by confession, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and to give sentence accordingly.

"Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, *at the discretion of the jury trying the case, which shall fix the penalty by its verdict.* The court shall impose the sentence so fixed, as in other cases. In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life." (Emphasis supplied)

but to fix the penalty of life imprisonment or death by its verdict. Where the defendant pleads guilty the court "shall, at its discretion, impose sentence of death or imprisonment for life". In this case the trial judge correctly charged the jury as follows: "If you conclude that the defendant is guilty of murder of the first degree a further duty rests upon you, and that is of fixing the penalty. You will have to, if you come to such a conclusion, state in your verdict whether he shall suffer death in the manner provided by law or undergo imprisonment for life."

The record shows that when the jury returned the roll was called and the jurors stated that their foreman would speak for them. The record then states "The foreman of the jury read the verdict of said jury, finding the defendant guilty of murder of the first degree, and recommending the death penalty". A separate entry says that "Upon request of counsel for defense the jury was polled, and each juror when his or her name was called, stated that he or she had found the prisoner guilty of murder in the first degree with the death penalty". This latter entry, however, does not purport to contain the exact language of the court officer or the response of each member of the jury. We must look at the formal verdict specifically placed of record and signed by its foreman. That is as follows: "And now, to-wit: June 21, 1957, we, the Jurors empaneled in the above entitled case, find Robert Tallie Davis guilty of first degree murder and recommend the death penalty. ROY G. WESTWOOD, Foreman". The court below, in its opinion, reciting the proceedings in the case, says: "Upon trial of the case the jury returned a verdict of guilty of murder of the first degree, with the recommendation of the death penalty." Upon that "verdict", after overruling motions for a new trial and in arrest of judgment, neither of which concerned it-

self with the present point, the court sentenced the defendant to death.

It is clear, to me at least, that although the trial judge correctly charged the jury as to its duty and responsibility, that body did not, according to this record, meet the responsibility placed upon it. It merely "recommended" the death penalty: it did not fix it. It showed no consciousness that its decision was irrevocable as it is under our law. The statute provides: "The court shall impose the sentence *so fixed,* as in other cases." But the trial jury fixed no sentence; it merely recommended it. To whom was this recommendation made? Certainly not the trial judge, because he had no power to act upon a recommendation. His duty as to the imposition of sentence is purely ministerial. Certainly not to this Court, for we have denied to ourselves, mistakenly I think, the right to modify a death penalty fixed by a jury. *Commonwealth v. Carluccetti,* 369 Pa. 190, 85 A. 2d 391 (1952); *Commonwealth v. Simmons,* 361 Pa. 391, 65 A. 2d 353 (1949). The recommendation by the jury of a death sentence is a decision completely unknown to our law and should not have been received by the court nor acted upon. The jury did not exercise its sole "discretion"; it passed it on, or at least shared it, with others. If on a plea of guilty the court determined that the homicide was murder of the first degree and entered an order "recommending" the death penalty, surely such a finding could not be accepted by this Court. Nor could the Governor of the Commonwealth accept it as the basis for a warrant of execution. Yet there is no difference between that situation and the present one. It seems to me that a decision which spells the difference between life and death must avoid the least possible uncertainty. I agree that it may reasonably be argued that the jury's recommendation may

have been meant by them to be tantamount to a "fixing" of the penalty; but I insist that it may also be argued that the jury was recommending the death penalty in the belief that some power existed elsewhere to accept or refuse such recommendation. The point I make is that the meaning of the jury's "true deliverance" must not be made the subject of reasonable debate; it must be put beyond differences of opinion.

In *Commonwealth v. Petrillo,* 338 Pa. 65, 12 A. 2d 317 (1940), the jury recommended the death penalty. We correctly held that this was not the same thing as fixing the death penalty; but in that case we said that the situation was cured by virtue of the fact that the crier, in repeating his understanding of the jury's verdict, used the word "fix" instead of "recommend" and the jury assented. Believing, as I do, that the trial judge should not have left such an important matter to the crier, I do not agree with the reasoning in that case; but in any event, it is no authority for what was done here.

In *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743 (1953), the reverse of the *Petrillo* situation appeared. There the jury fixed the penalty but the court clerk recorded the verdict as constituting a recommendation. There we held, rightly I think, that the court could correct the clerical error where there was no doubt that it misrepresented the facts.

I do not insist that in every case the jury need use the word "fix"; it is sufficient if they, by any unmistakable language, demonstrate by their verdict that they have accepted the responsibility of finally imposing the punishment which is to be meted out. In my opinion, this record shows that they did not do that but contented themselves only with the making of a recommendation, to persons unknown, who might or might not have power to accept or reject such recom-

mendation. The general understanding, legal and lay alike, is that one who merely recommends a decision is not thereby making the decision itself or accepting responsibility for the decision. Juries generally are fully conscious and are sometimes told specifically of their right to make a recommendation of mercy. Nobody pretends that this recommendation is binding except where the statute specifically says so.

It seems to me that the jury's consciousness of its ultimate responsibility, in this case, was not of that degree required by law and its verdict should not have been received and acted upon. Further deliberation was required.

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES AND MR. JUSTICE BELL:

We fail to see any impropriety, let alone reversible error, in the able district attorney's cross-examination of the patently dissembling defendant with respect to his prior penal servitude, already matter of trial record.