Commonwealth *v.* Garrison, Appellant.

48

Argued October 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*Charles D. Coll,* with him *William G. Boyle,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *William Claney Smith,* Assistant District Attorney, and *Edward C. Boyle,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BOK, December 30, 1959:

William Garrison was convicted of first degree murder, with penalty set at life imprisonment, for having taken part in events that caused the death of Elizabeth Ensinger, an old lady of eighty-four.

Four other persons had already been tried. Vincent Scatena pleaded not guilty, and Michael Popovich and Frank Zaffina pleaded guilty. Their offense was also fixed at murder in the first degree and their punishment at life imprisonment. Ann Dixon Garrison,

defendant's wife, was indicted as an accessory, was found guilty of murder in the second degree, and was sent to the Industrial Home for Women at Muncy.

The unusual cause of Mrs. Ensinger's death was shock and hemorrhage following a comminuted fracture of the jaw that pierced the face and constituted, medically, a "stab" wound.

The evidence reveals that Ann Garrison at one time had worked for Scatena as a waitress in his tavern. She had once lived next door to Mrs. Ensinger and had told Scatena that the old lady kept money in her house: she was supposed to be worth between seventy and a hundred thousand dollars. Scatena then sent to Cleveland for two ex-convicts, Popovich and Zaffina, to take care of some illegal business for him. On November 16, 1957, the day before the ultimate episode, Ann Garrison was introduced to Popovich in Scatena's tavern and told him that she knew he was in business for money and had a prowl job (burglary) for him in a house that was worth plenty. They were interrupted at that point and she told Popovich to talk further to Scatena about the affair.

The next day all but the Garrisons met at the tavern and after making a telephone call, Scatena said that they should go over to "meet them". They then drove to Garrison's house and found defendant working on his car. The three men spoke to defendant, who pointed out Mrs. Ensinger's house, gave them a general description of it, and told them where to find the old lady's money-box and key. After this they got into Garrison's car because the car in which they had come bore an Ohio license and they drove twice past Mrs. Ensinger's house, once in front and once in back. During this drive defendant told the others the best time and place to enter. As he left them he urged them not to hurt Mrs. Ensinger and was told that he would be taken care of.

At about seven o'clock Popovich and Zaffina, leaving Scatena and a girl in their parked car, rang Mrs. Ensinger's bell and were admitted by her. They pushed her down, but when Popovich put his hand over her mouth she bit him. In exasperation he struck her and broke her jaw, giving her the injuries from which she soon died. They gagged and taped her and ransacked the house, finding no money-box and nothing of value to them save seventeen cents. Concerned over Mrs. Ensinger's condition, they hastily left the house, put in an anonymous telephone call to the police for an ambulance, and left, via Scatena's tavern, for Cleveland. When the ambulance arrived Mrs. Ensinger was dead.

During the burglary the Garrisons sat in their car in a vacant lot across the street from the Ensinger house and watched Popovich and Zaffina enter by the front door. They then drove to the rear of the house and saw them leave by the back door, after which they too went to Scatena's tavern but had no talk with anyone.

It was the Commonwealth's theory that all five persons now tried and convicted had conspired to burglarize and rob Mrs. Ensinger, and that although nothing was taken, a burglary was committed in the commission of which the victim received fatal injuries. This involved Popovich and Zaffina directly, Scatena and Garrison indirectly, under the felony-murder rule (*Commonwealth v. Doris*, 287 Pa. 547 (1926), 135 A. 313; *Commonwealth v. Redline*, 391 Pa. 486 (1958), 137 A. 2d 472), and Mrs. Garrison as an accessory. The evidence so obviously supports these theories of guilt that they have not been assigned as error, nor has the sufficiency of the evidence.

Looking at the case broad on the beam for any basic error (*Commonwealth v. Stowers*, 363 Pa. 435 (1950), 70 A. 2d 226), we see none. Some plaint is

made because trial counsel offered few objections at trial and let in some damaging and improper evidence. Special reference is made to Popovich's testifying to what Ann Garrison said to him in the tavern about a prowl job. In this and other matters we think that trial counsel did a good journeyman's job and achieved both inherent and comparable justice. The challenged evidence was conversation between co-conspirators during the conspiracy, which is an exception to the hearsay rule and admissible: *Commonwealth v. Hancock*, 177 Pa. Superior Ct. 585 (1955), 112 A. 2d 407. The co-conspirator whose declaration is testified to need not be on trial: *Commonwealth v. Biddle*, 200 Pa. 640 (1901), 50 A. 262, and no conspiracy need be charged: *Commonwealth v. Petrillo*, 338 Pa. 65 (1940), 12 A. 2d 317. The defendant against whom the declaration is used need not be present when it was made: *Commonwealth v. Spardute*, 278 Pa. 37 (1923), 122 A. 161.

Nor is such evidence an evasion of the Act of May 23, 1887, P.L. 158 §2(b); 19 P.S. §683, as amended, which forbids husbands' and wifes' testifying against each other. Mrs. Garrison did not testify, and we do not regard the evidence ascribed to her as being the equivalent of testimony. It was not against her husband and did not refer to him: hence it falls within the rule of *Welker v. New York Central Railroad*, 275 Pa. 82 (1922), 118 A. 615, and *Commonwealth v. Johnson*, 213 Pa. 432 (1906), 62 A. 1064, that: "Facts which have been learned by competent witnesses are not to be excluded because the witness may have been put on the track of them by information coming incidentally or otherwise from the prisoner or his wife."

As Judge Hirt said in *Kerr v. Clements*, 148 Pa. Superior Ct. 378 (1942), 25 A. 2d 737: "What is prohibited by the act is testimony in any form by the wife or husband *against* the other. Extra-judicial admissions are a sort of testimony; hence the prohibition of

the act applies to them with the same force as though made by a spouse from the stand."

This doctrine rendered incompetent letters between husband and wife, in *Commonwealth v. Fisher,* 221 Pa. 538 (1908), 70 A. 865, but it is an altogether different situation from that in the instant case.

The evidence of the Garrisons' joint activity comes from defendant's statement given orally to the police and from his own testimony on the stand. Although the point was not raised, we observe in passing that this was harmless, vis-à-vis the wife, since she had already been tried and incriminated.

Defendant also complains of the District Attorney's bringing out the criminal past of his witnesses and of his cross-examining defendant about his own.

We see no reason to nullify a prosecutor's manoeuvre in anticipating what he may be sure defense counsel will bring out. This is not impeaching counsel's own witness but rather the legitimate thrust and riposte of trial tactics.

As for the prosecutor's reference to defendant's past crimes, we need only say that his counsel mentioned them in her opening to the jury and then asked her client about them. We need not necessarily assume that she had in mind *Commonwealth v. Parker,* 294 Pa. 144 (1928), 143 A. 904, and *Commonwealth v. Davis,* 396 Pa. 158 (1959), 150 A. 2d 863. She may have been seeking credit for him in making a clean breast of his life, or in doing just what the Commonwealth had done.

A defendant may voluntarily step beyond the protection of the Act of March 15, 1911, P.L. 20, 19 P.S. §711, which prohibits the introduction of evidence of other crimes, and if he does so he may be cross-examined about them: *Commonwealth v. Quaranta,* 295 Pa. 264 (1928), 145 A. 89; *Commonwealth v. Farley,* 168 Pa. Superior Ct. 204 (1951), 77 A. 2d 881.

Other objections are flyweight and of no merit.
The judgment of sentence is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion says: "Defendant also complains of the District Attorney's bringing out the criminal past of his witnesses and of his cross-examining defendant about his own. We see no reason to nullify a prosecutor's manoeuvre in anticipating what he may be sure defense counsel will bring out. This is not impeaching counsel's own witness but rather the legitimate thrust and riposte of trial tactics."

The practice which the Majority cavalierly approves as "legitimate thrust and riposte of trial tactics" is something more serious than what the Majority says it is. The prosecutor's actions were not "thrust and riposte of trial tacts", but thrust and twisting of the dagger in the vitals of a solemn Act of the Legislature which specifically says that: "Hereafter any person charged with crime and called as a witness in his own behalf, shall not be asked, and if asked shall not be required to answer, any questions tending to show that he has committed or, been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation. . ." (Act of May 15, 1911, P.L. 20).

The Majority Opinion says that the prosecuting Attorney has the right to manoeuvre so as to anticipate "what he may be sure defense counsel will bring out." There is nothing in the law which says that prosecution counsel may anticipate what defense counsel will bring out, and certainly nothing which assigns to him clairvoyant powers which enable him to predict what defense counsel will do and say. But even if he had a crystal bowl on his table and possessed the supernatural powers which the Majority so freely assigns to every

prosecuting attorney, he still would have no right to do what the law specifically says he *must not do!*

The Majority also blithely ignores what this Court emphatically stated as recently as May 8, 1959, in the case of *Commonwealth v. Davis,* 396 Pa. 158: "These continuous and persistent references during cross-examination to defendant's past cannot be justified on any 'credibility attack' theory. The prosecuting attorney's cross-examination served as a convenient sounding board upon which was echoed and re-echoed the fact that defendant had a criminal record and could not have failed to create a prejudice against defendant in the minds of the jury."

Another serious matter was presented in this case which the Majority assumes to be of trifling consequence. The Majority says: "Special reference is made to Popovich's testifying to what Ann Garrison said to him in the tavern about a prowl job. In this and other matters we think that trial counsel did a good journeyman's job and achieved both inherent and comparable justice. The challenged evidence was conversation between co-conspirators during the conspiracy, which is an exception to the hearsay rule and admissible."

Whether trial counsel did a good journeyman's job (and achieved "both inherent and comparable justice," whatever that may be) is not the issue. The issue is whether the Commonwealth should be permitted to introduce evidence against the defendant from the mouth of the wife of the defendant, in defiance of a statute of the Commonwealth which specifically prohibits that very thing. The Act of May 23, 1887, P.L. 158, specifically mandates: "Nor shall husband and wife be competent or permitted to testify against each other." This inhibition is not limited to declarations in court but applies to declarations of all kinds. Wigmore says in his treatise on Evidence, 3rd Edition,

§2232: "Extrajudicial admissions are a sort of testimony; hence [the prohibition of the act applies to them with the same force as though made by a spouse from the stand]. That which is privileged is testimony in any form, by the wife or husband against the other."

That the defendant in this case may not be a model citizen is not for this Court to pass upon. Every decision rendered by this Court becomes a pier for the bridge over which future defendants must pass. To the extent that that bridge is weakened by a bad decision, to that extent an innocent person in the future may plunge through the bridge into the sea of unjust conviction, degradation, shame and disaster.

I dissent.

DISSENTING OPINION BY MR. JUSTICE McBRIDE:

I agree that the language of Judge HIRT in *Kerr v. Clements*, 148 Pa. Superior Ct. 378, 25 A. 2d 737, in referring to the Act of May 23, 1887, P.L. 158, 19 P.S. §683, as amended, is applicable to this case. Judge HIRT said: "What is prohibited by the act is testimony in any form by the wife or husband *against* the other. Extra-judicial admissions are a sort of testimony; hence the prohibition of the act applies to them with the same force as though made by a spouse from the stand."

Thus it is seen that the alternatives are that the declaration of the wife was against her husband or it was not. If it was not, it was not admissible in this case since in that event it would be admissible only against herself and she was not on trial with him. If it was, then it falls within the ban of the rule as stated. Believing it to be error to have admitted it, I cannot escape the conclusion that it harmed the defendant. It is therefore unnecessary to consider, under the circumstances of this case, (a) whether the wife can be and (under the evidence aliunde the decla-

ration itself) was a co-conspirator with her husband and (b) whether the declaration was in furtherance of a conspiracy between her and her husband as distinguished from a conspiracy between her and the others. Hence, I dissent.