425 A.2d 393

**COMMONWEALTH of Pennsylvania**

v.

**Leroy SMITH, Appellant.**

Superior Court of Pennsylvania.

Submitted March 21, 1980.

Filed April 20, 1981.

Stephen Gross, Assistant Public Defender, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, BROSKY and VAN der VOORT, JJ.

BROSKY, Judge:

Smith was charged with simple assault, terroristic threats and possessing an instrument of crime. At trial, the prosecutor asked appellant if he had been convicted of larceny in 1970. Counsel moved for and received a mistrial.[1] A retrial was set for March 26, 1979; and before that trial began, appellant moved for a dismissal on the grounds of double jeopardy. The motion was denied. A writ of certiorari was filed and denied and this interlocutory appeal followed. We affirm the order of the trial court.

1. 42 Pa.C.S.A. § 5918 (formerly 19 P.S. § 711).

■ Appellant claims his retrial will result in his being held in jeopardy twice. However, a retrial on double jeopardy grounds is only prohibited where "there is found to have been prosecutorial misconduct intended to provoke mistrial requests[,]" *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267, 276 (1976); *Commonwealth v. Gravely*, 486 Pa. 194, 404 A.2d 1296 (1979), or where the prosecution takes an action which prejudices or harasses the defendant. *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980).

In the instant case, the appellant testified he had thrown a beer can against the wall of the grocery store and that he possessed a knife. Pettaway testified he ordered Smith out of the store because appellant entered it carrying a beer can. An argument ensued, after which Pettaway and another security guard escorted appellant from the store. Smith reentered, whereupon more arguing occurred, during which appellant threatened to "cut" Pettaway. Smith was taken out of the store again and as the security guards turned their backs to him and walked to reenter the store, appellant hurled and struck Pettaway with a beer can. Pettaway, then turned toward Smith who approached him. The other security guard rushed appellant back away from Pettaway. Then Smith approached Pettaway again. This time, Pettaway saw the butt of a knife in the appellant's pocket while Smith was walking toward Pettaway with his hands in his pockets. Pettaway testified he struck appellant to save himself from attack.

The appellant admitted on the stand that he was carrying a knife. He also stated that he threw a beer can. However, he did not testify that he intended to strike Pettaway. After Smith made these statements, the Commonwealth began to cross-examine him during which time the prosecution asked appellant if he had been convicted of larceny in 1970. Appellant's trial counsel moved for and received a mistrial. Before a second trial was held, Smith appealed claiming a second trial would hold him in double jeopardy.

■■■■ The protections accorded an individual by the double jeopardy clause attach before a final judgment is reached:

Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have his trial completed by a particular tribunal." The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

The words "manifest necessity" appropriately characterize the magnitude of the prosecutor's burden. For that

reason Mr. Justice Story's classic formulation of the test has been quoted over and over again to provide guidance in the decision of a wide variety of cases. Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.

The question whether that "high degree" has been reached is answered more easily in some kinds of cases than in others. At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice. As this Court noted in *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267:

"The Double Jeopardy Clause does protect a defendant against governmental actions *intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions.* It bars retrials where 'bad-faith conduct by judge or prosecutor' . . . threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant."

*Arizona v. Washington*, 434 U.S. 497, 503–509, 98 S.Ct. 824, 829–832, 54 L.Ed.2d 717, 726–30, (1978) (emphasis added).[2]

■ Clearly, we must reach a determination as to whether the prosecution *intentionally* sought to bring about a mis-

2. Normally, however, where the defendant requests a mistrial, the double jeopardy rule is not effective. *United States v. Dinitz*, supra.

trial request. *Commonwealth v. Gravely,* supra. Our Supreme Court has not specifically presented us with a test by which we are to determine if the prosecution's actions were intentional. However, we are able to discern from its opinion in *Commonwealth v. Gravely,* supra, that our decision must be based upon a review of the entire record viewed within the totality of the circumstances.

The dispute arises out of the Commonwealth's cross-examination of the appellant:

BY MR. ROSENTHAL:

Q. You never threatened Mr. Pettaway at all?

A. No.

Q. So after you left the store, you heard footsteps behind you?

A. Right.

Q. How far were they behind you?

A. When I turned around, they were like maybe eight feet and coming.

Q. Coming at you?

A. That's right.

Q. Did he have anything in his hand?

A. His partner had his stick.

Q. He had it out?

A. Yes.

Q. Were they running toward you?

A. No, they were just walking about maybe the same pace I was walking. I couldn't judge, you know, exactly.

Q. And you stopped and turned around?

A. I stopped.

Q. Did his partner hit you at all?

A. On the arm with the stick when I put my arm up.

Q. How about Mr. Pettaway? Did he hit you at all?

A. Yes.

Q. Where did he hit you?

A. Across the bridge, which fractured my nose.

Q. Did you tell the police about that?

A. Yes.

Q. Did you take out any type of criminal complaint against either of the officers?

MR. MYERS: I object.

THE COURT: Sustained.

BY MR. ROSENTHAL:

Q. On May 5th, 1970, in the City of Philadelphia were you found guilty of a crime of larceny, sir?

A. Yes.

MR. MYERS: I object.

THE COURT: Sustained.

MR. MYERS: I move for a mistrial.

The trial court subsequently granted a motion for a mistrial.

Finally, we must determine whether the prosecution's alleged misconduct was "undertaken in bad faith to prejudice or harass the defendant," *Commonwealth v. Starks*, supra, 490 Pa. at 342, 416 A.2d at 500. We hold it was not. The District Attorney stated "[m]y understanding of case law in Pennsylvania is that I am allowed to ask" questions regarding appellant's criminal record. Clearly there are circumstances, though limited, where such evidence is admissible. *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973); *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978). We do not hold that under the circumstances of the instant case that the prosecution acted in "bad faith." *Commonwealth v. Palmer*, 276 Pa.Super. 473, 419 A.2d 555 (1980).[3]

We are satisfied that the prosecution's statements were inadvertent and not said in bad faith or with the intent to cause a mistrial request.

Order affirmed.

SPAETH, J., files dissenting opinion.

---

**3.** We do not hold that our Supreme Court's evenly divided decision in *Commonwealth v. Hoskins*, —— Pa. ——, 432 A.2d 149 (1981) concludes that the prosecution in the instant case acted in "bad faith."

SPAETH, Judge, dissenting:

In *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980), the Supreme Court stated that a retrial is barred by "prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant." *Id.*, 490 Pa. at 342, 416 A.2d at 500. In my opinion, the record here discloses such conduct.

−1−

The evidence consisted of the testimony of two individuals: the Commonwealth's witness, Pettaway; and appellant.

Pettaway's testimony may be summarized as follows: Pettaway and his partner were on duty as security guards at a grocery store. They were in full uniform, and armed with guns, nightsticks, and handcuffs. Appellant entered the store, carrying a can of beer. When asked to leave the store, appellant became disorderly. After being led out, appellant threatened to "cut [Pettaway's] guts off." N.T. 7. Also, when Pettaway's back was turned, appellant threw a can of beer at Pettaway, and hit him with it. N.T. at 4–12. On turning around, Pettaway saw appellant coming towards him. He saw "the butt" of a knife in appellant's pocket, N.T. 11, which appellant was trying to get out, *id.* He hit appellant, who fell back, and his partner apprehended appellant. N.T. 12. When the police arrived, they took a knife from appellant's pocket. It was closed, and about two inches long; open, probably four or five inches. N.T. 13. On cross-examination, Pettaway admitted that when he hit appellant, on the nose, he had a pair of handcuffs wrapped around his hand. N.T. 20.

Appellant's testimony may be summarized as follows: Appellant admitted entering the store with a can of beer in his hand. He said that Pettaway grabbed him, ordered him to leave, and became verbally abusive. N.T. 24–26. When outside the store Pettaway insulted him, N.T. at 27 & 29, and out of anger he threw a can of beer against the wall of the store, N.T. at 29. Pettaway's partner came at him with nightstick raised, causing him to duck, and Pettaway hit him on the nose. N.T. at 30. Appellant denied threatening

Pettaway with a knife, N.T. at 31, and denied hitting Pettaway with the can of beer, N.T. at 29. He admitted having a knife, but described it as a work tool with a two-inch blade. N.T. at 31. He denied ever handling the knife during the altercation, and said at the time, he had forgotten all about it. N.T. at 31.

On cross-examination of appellant, the following occurred:

Q. You never threatened Mr. Pettaway at all?

A. No.

Q. So after you left the store, you heard footsteps behind you?

A. Right.

Q. How far were they behind you?

A. When I turned around, they were like maybe eight feet and coming.

Q. Coming at you?

A. That's right.

Q. Did he have anything in his hand?

A. His partner had his stick.

Q. He had it out?

A. Yes.

Q. Were they running toward you?

A. No, they were just walking about maybe the same pace I was walking. I couldn't judge, you know, exactly.

Q. And you stopped and turned around?

A. I stopped.

Q. Did his partner hit you at all?

A. On the arm with the stick when I put my arm up.

Q. How about Mr. Pettaway? Did he hit you at all?

A. Yes.

Q. Where did he hit you?

A. Across the bridge of the nose.

Q. Did you tell the police about that?

A. Yes.

Q. Did you tell the police also about getting hit on the arm with the stick?

A. Yes.

Q. Did you take out any type of criminal complaint against either of the officers.

A. Mr. Myers: I object.

THE COURT: Sustained

Q. On May 5, 1970, in the City of Philadelphia were you found guilty of a crime of larceny?

A. Yes.

N.T. at 32–34.

At this point defense counsel moved for a mistrial. The motion was granted. The prosecutor then stated:

My understanding of case law in Pennsylvania is that I am allowed to ask someone if, in fact, he is guilty of the crime of larceny.

N.T. at 34.

–2–

In *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918 (1978), the Supreme Court stated that prosecutorial misconduct is sufficient to bar retrial only

when the prosecuting lawyer, judged by an objective standard, must be deemed to have been substantially certain that a mistrial would be declared as a result of his questions to witnesses or other conduct at trial. 478 Pa. at 267, 386 A.2d at 925.

We have had occasion to apply this statement of the law in several cases. *Commonwealth v. Palazzo*, 275 Pa.Super. 173, 418 A.2d 649 (1980) (no bar to retrial although prosecutor knew he was risking prejudicial answer); *Commonwealth v. Thomas*, 270 Pa.Super. 375, 411 A.2d 767 (1979) (no bar to retrial although prosecutor twice engaged in prejudicial line of questioning); *Commonwealth v. Perry*, 270 Pa.Super. 412, 411 A.2d 786 (1979) (no bar to retrial although prosecutor improperly referred to suppressed evidence on four different occasions).

70

Recently, the Supreme Court has restated the law, and in doing so, has expanded upon its statement in *Potter.* In *Commonwealth v. Starks,* 490 Pa. 336, 416 A.2d 498 (1980), the Court held that even if not designed to provoke a mistrial, prosecutorial misconduct may nevertheless bar retrial. Said the Court:

First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. *See United States v. Dinitz, supra* [424 U.S. 600] at 611, 96 S.Ct. at 1081, [47 L.Ed.2d 267]. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. *See Lee v. United States, supra,* [432 U.S. 23] at 32, 97 S.Ct. 2141 at 2147 [53 L.Ed.2d 80]; *United States v. Dinitz, supra* at 611, 96 S.Ct. at 1081–82. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against. 490 Pa. at 342, 416 A.2d at 500.

*Accord, Commonwealth v. Lee,* 490 Pa. 346, 416 A.2d 503 (1980).

–3–

As reference to the passage from *Starks* just quoted demonstrates, a retrial should be barred if three facts are proved: (1) "prosecutorial misconduct"; (2) "undertaken in bad faith"; (3) "to prejudice or harass" the defendant. What we must decide therefore, is whether here these facts have been proved.

Without doubt, there was "prosecutorial misconduct." To ask appellant whether he had been found guilty of larceny was plainly improper—as will be discussed further in a moment—and the lower court had no choice but to grant defense counsel's motion for a mistrial. Nor does the Commonwealth argue otherwise.

Also without doubt, the prosecutorial misconduct was intended "to prejudice" appellant. A verdict against appellant depended on the trier of fact believing Pettaway instead of appellant. The prosecutor therefore decided to discredit appellant by eliciting evidence of appellant's criminal record. Evidence of a criminal record is probably the most prejudicial sort of evidence there is. As Justice NIX, writing for the majority in *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364 (1978), noted, "It would be naive to conclude that a lay finder of fact is capable of eradicating the prejudice which results from the knowledge of a witness's prior record." *Id.*, 482 Pa. at 36, 393 A.2d at 365 (footnote omitted). *See also*, Krauser, "The Use of Prior Convictions as Credibility Evidence: A Proposal for Pennsylvania," 46 Temple L.Q. 291 (1973). Here, to be sure, the trial was before a judge alone, but that in no way affects the conclusion that the prosecutor intended to prejudice appellant in the eyes of the judge by eliciting evidence of appellant's criminal record. Again, the Commonwealth does not argue otherwise.

The only issue, therefore, is whether the prosecutorial misconduct was "undertaken in bad faith . . . ." The Commonwealth argues that it was not. It says that "[t]he record shows merely a single inadvertent instance of error by the prosecutor." Brief for Commonwealth at 2. The Commonwealth goes on to say that "[i]t is inconceivable that [the] prosecutor . . . would deliberately choose to abort the trial." *Id.* Similarly, the majority opinion says that "[w]e are satisfied that the prosecution's statements were inadvertent and not said with the intent to cause a mistrial request." At 396. I am unpersuaded.

Initially, it may be noted that the majority and the Commonwealth both fail to distinguish between prosecutorial misconduct intended to cause a mistrial—which is the first sort of misconduct noted in *Starks*—and prosecutorial misconduct undertaken in bad faith to prejudice the defendant—which is the second sort of misconduct noted in *Starks*. I am willing to concede that here the prosecutor did not intend to cause a mistrial, and therefore did not engage in

the first sort of misconduct noted in *Starks*.[1]  The question remains, however, whether the prosecutor engaged in the second sort of misconduct noted in *Starks*, and as just discussed, that question reduces itself to a single issue, namely, whether the prosecutor acted in "bad faith."  I believe he did.

The clearest evidence of the prosecutor's bad faith in his own statement to the court, which has been quoted in full above, that "[m]y understanding of case law in Pennsylvania is that I am allowed to ask" appellant whether he had a criminal record.  Not only is there no such case law, but all the law is the other way.

With two exceptions, not pertinent here, Pennsylvania law has since 1911 prohibited a prosecutor from asking a defendant whether he has a criminal record.  Thus the Act of 1911, March 15, P.L. 20 § 1, provides:

> Hereafter any person charged with any crime, and called as a witness in his own behalf, shall not be asked, and, if asked, shall not be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation; unless,—

> One.  He shall have at such trial, personally or by his advocate, asked questions of the witness for the prosecu-

---

1.  Appellant argues that the prosecutor "must have been substantially certain" that a mistrial would be declared, suggesting that "[i]t is preposterous to believe" that an attorney assigned to the trial of criminal cases would not know that the question asked here was improper.  Brief for Appellant at 6.  Appellant also argues that at a retrial the Commonwealth will have the advantage of calling Pettaway's partner as an additional witness.  *Id.* at 7.  No explanation was offered at trial why Pettaway's partner was not called as a witness, and given that the case turns entirely on credibility, the advantage of calling him at a second trial might be considerable.  Appellant notes that in contrast, in *Commonwealth v. Potter, supra,* the Commonwealth's evidence "was overwhelming," 478 Pa. at 272, 386 A.2d at 928, so that no reason for seeking a mistrial appeared.  *Id.* at 6–7.  On my view of the law, I need not respond to these arguments.  It seems to me, however, that the majority should respond to them.

tion with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or,

Two. He shall have testified at such trial against a co-defendant, charged with the same offense. 1911, March 15, P.L. 20, § 1.

19 P.S. § 711. Repealed, Act of 1978, April 28, P.L. 202, No. 53 *eff.* June 27, 1978.

This statute was substantially re-enacted in the new Judicial Code:

No person charged with any crime and called as a witness in his own behalf, shall be asked, or if asked, shall be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation unless:

(1) he shall have at such trial, personally or by counsel, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or

(2) he shall have testified at such trial against a codefendant, charged with the same offense.

1976, July 9, P.L. 586, No. 142, § 2, eff. June 27, 1978. 42 Pa.C.S.A. § 5918.

The case law on the Act of 1911 is abundant. *See e. g., Commonwealth v. Borschell*, 462 Pa. 605, 342 A.2d 97 (1975); *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844 (1974); *Commonwealth v. Craft*, 455 Pa. 616, 317 A.2d 213 (1974); *Commonwealth v. Bunch*, 454 Pa. 365, 311 A.2d 632 (1973), *later appealed Commonwealth v. Bunch*, 466 Pa. 22, 351 A.2d 284 (1976); *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973); *Commonwealth v. Smith*, 450 Pa. 332, 299 A.2d 280 (1973); *Commonwealth v. Barron*, 438 Pa. 259, 624 A.2d 710 (1970); *Commonwealth v. Davis*, 396 Pa. 158, 150 A.2d 863 (1959); *Commonwealth v. Albright*, 226 Pa.Super. 506, 313 A.2d 284 (1973); (HOFFMAN, J. opinion in

support of reversal), *Commonwealth v. Allen*, 220 Pa.Super. 403, 289 A.2d 476 (1972). Equally abundant is textual and scholarly comment. *See e. g.*, McCormick, *Handbook on Evidence* (2d ed. 1972) § 43; *Wigmore on Evidence* (3d ed. 1940) § 194b; S. Pugliese, "Criminal Conduct as an Instrument of Testimonial Impeachment in Pennsylvania," 4 Temple L.Q. 123 (1930). Developments in the law have also been well noted. *See e. g.*, Metz, "Evidence" 19 Pitt.L.Rev. 473, 475 (1958); Plowman, "Evidence" 21 Pitt.L.Rev. 421, 422 (1959); Litman, "Evidence" 27 Pitt.L.Rev. 509, 580 (1966). *See also Feldman, Pennsylvania Trial Guide*, Vol. 1, § 6.34 (revised ed. 1973); *Jenkins, Pennsylvania Trial Evidence Handbook*, § 17.7 (1st ed. 1974).

Case law does permit the Commonwealth to impeach a defendant by evidence of a criminal record, but the evidence must be introduced in rebuttal, and the trial court must determine that the probative value of the evidence outweighs its prejudicial impact. Specifically, the trial court must consider

> . . . the age and nature of the prior crimes; the length of the criminal record; the age and circumstances of the defendant; the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of the prior crime.

*Commonwealth v. Bighum, supra*, 452 Pa. at 566, 307 A.2d at 362 (1973). *And see Commonwealth v. Roots, supra.*[2]

2. Appellant's attorney argued below that the prosecutor was not prepared to introduce evidence concerning appellant's prior conviction in accordance with *Bighum* and *Roots* since the Commonwealth never requested a hearing to determine whether evidence of appellant's criminal record could be admitted into evidence. Appellant's attorney also argued that such evidence would not be admissible had a hearing been held because the conviction in question was eight years old and would not be sufficiently relevant to overcome its prejudicial impact. *See* Transcript on Petition to Dismiss at 12. Appellant therefore suggested that the Commonwealth was attempting to do by illegal means that which it was not prepared to do by legal means. *Id.* at 11. The Commonwealth's attorney, who had not been trial counsel, objected that the suggestion had not been proved. Appellant's attorney then requested a hearing so that he could

Here the prosecutor must have known that there was law on the propriety of his question to appellant; that much is shown by his statement to the court about "case law in Pennsylvania." Either the prosecutor had looked up that law, or he had not. If he had looked up the law, then he must have known that his question was improper. If he had not looked up the law, then he must have known that he did not know what the law was, and his question to appellant was in deliberate ignorance of the law. Either way, the question was in bad faith.

In *Commonwealth v. Starks, supra,* the Court found no bad faith in part because the prosecutor was responding to "the intemperate closing argument of defense counsel." 490 Pa. at 342, 416 A.2d at 501. In *Commonwealth v. Lee, supra,* the Court found no bad faith where "the prosecutor, in the heat of legal argument and responding to a question for the Court, informed the Court that the witness in question had taken a polygraph examination." 490 Pa. at 350, 416 A.2d at 505. No such extenuating circumstances appear here.[3]

question the assistant district attorney who conducted the trial. Such a hearing was never held. *Id.* at 10.

**3.** The Supreme Court has most recently addressed the issue of prosecutorial misconduct in *Commonwealth v. Hoskins,* —— Pa. ——, 432 A.2d 149 (1981). In *Hoskins* an evenly divided court affirmed an order denying the defendant's pre-trial motion to dismiss indictments for criminal homicide on the ground of double jeopardy. Justice KAUFFMAN'S opinion in support of affirmance applied the standard outlined in *Commonwealth v. Starks, supra,* but concluded that a retrial was not barred because "[t]here is no accusation here of deliberate provocation, and under all the circumstances of this case, I do not believe that bad faith has been shown." *Id.* —— (slip opinion at ——). In his opinion, Justice Roberts, joined by the Chief Justice and Justice Flaherty, would have reversed. It is therefore clear that four members of the Court agree that retrial is barred either where the prosecutor deliberately provokes a mistrial or where he acts in bad faith.

*Hoskins* also supports the conclusion that in the present case, the prosecutor's conduct constituted bad faith. While not expressly stated, the basis of Justice KAUFFMAN'S opinion that the prosecutor did not act in bad faith appears to have been the Justice's view that the evidence in favor of the Commonwealth was so strong that there was no reason for the prosecutor to resort to prejudicial

In *Breed v. Jones*, 421 U.S. 519, 530, 95 S.Ct. 1779, 1786, 44 L.Ed.2d 346, (1975), Chief Justice BURGER wrote that a criminal proceeding "imposes heavy pressures and burdens—psychological, physical, and financial—on a person charged. The purpose of the Double Jeopardy Clause is to require that he be subject to the experience only once 'for the same offence.'" Unless we give some substance to the "bad faith" test stated in *Commonwealth v. Starks, supra,* these words will amount to little more than a pious generality, for it will be a rare case where the prosecutor admits, or the record demonstrates, a deliberate intent to cause a mistrial.

The order of the lower court should be reversed.

tactics. Thus the Justice wrote: "The Opinion in Support of Reversal implies that the Commonwealth resorted to prejudicial and inflammatory tactics in order to compensate for deficiencies in what was otherwise a vague, weak circumstantial case. Nothing could be further from the truth." *Id.* at —— (Slip opinion at ——). Here, in contrast, the evidence in favor of the Commonwealth would suffice for a guilty verdict only if the trier of fact did not believe appellant, so that it may be said that in attempting to damage the credibility of appellant, the prosecutor was acting to compensate for deficiencies in the Commonwealth's case. It therefore seems reasonable to suggest that a majority of the Supreme Court would find prosecutorial overreaching in this case.