432 A.2d 149

COMMONWEALTH of Pennsylvania,

v.

William HOSKINS, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 23, 1980.

Decided Feb. 4, 1981.

Reargument Denied March 13, 1981.

Joel Harvey Slomsky, Philadelphia, for appellant.

Robert B. Lawler, Chief, Appeals Div., Michelle Goldfarb, Asst. Dist. Attys., for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

ORDER

PER CURIAM:

The Court being equally divided, the order of the Court of Common Pleas of Philadelphia is affirmed.

NIX, J., files an Opinion in Support of Affirmance.

KAUFFMAN, J., files an Opinion in Support of Affirmance.

LARSEN, J., would affirm.

ROBERTS, J., files an Opinion in Support of Reversal, in which O'BRIEN, C. J., and FLAHERTY, J., join.

## OPINION IN SUPPORT OF AFFIRMANCE

NIX, Justice.

On numerous occasions, I have expressed my disagreement with the Court's use of a double jeopardy analysis in cases such as the one before the bar of the Court. *Commonwealth v. Starks,* 490 Pa. 336, 344, 416 A.2d 498, 502 (1980) (Nix, J. dissenting opinion); *Commonwealth v. Lee,* 490 Pa. 346, 416 A.2d 503 (1980) (Nix, J. concurring opinion); *Commonwealth v. Potter,* 478 Pa. 251, 287, 386 A.2d 918, 936 (1978) (Nix, J., Opinion in Support of Reversal). In this case the jury reached a verdict. Because of the presently complained of conduct on the part of the prosecution, this Court on direct appeal granted appellant a new trial, *Commonwealth v. William Hoskins,* 485 Pa. 542, 403 A.2d 521 (1979). Now on an interlocutory appeal, see *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977), prior to the commencement of the new trial that was awarded, this Court sees fit to find a double jeopardy violation and precludes further prosecution for this heinous murder. In my judgment, this result is legally untenable and permits a grave travesty upon justice. Prosecutorial misconduct may reach the point where due process would require the foreclosure of a subsequent trial for the same charges, however, such a point has not been reached in this case and the remedy of the award of the new

trial adequately protected appellant from the prosecutorial misconduct that has been cited.

The Court's error stems from its persistent refusal to recognize that prosecutorial misconduct is generally a due process concern and not a matter of double jeopardy. This confusion arises from the misreading of *U.S. v. Dinitz*, 424 U.S. 60, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). *See Commonwealth v. Potter*, 478 Pa. 261, 386 A.2d 918 (1978) (Opinion in Support of Affirmance). In *Dinitz* prosecutorial misconduct became important in a double jeopardy context where that conduct prevented the tribunal from reaching a verdict. The finality of the adjudicative process is a double jeopardy concern. The fact of the prosecutorial misconduct was significant in *Dinitz* only because it occasioned the interruption of the trial. In contra-distinction, due process is concerned with the fairness of the proceedings and trial error such as prosecutorial misconduct strikes at the very heart of the fairness and impartiality of the proceeding.[1]

1. Pertinent to the instant inquiry, we stated in *Commonwealth v. Hogan*, 482 Pa. 333, 340, 393 A.2d 1133, 1136 (1978):

Lastly, the double jeopardy clause should be strictly construed by reference to its historical purposes, as outlined above. Although "[t]hese historical purposes are necessarily general in nature, and their application has come to abound in often subtle distinctions ... the primary purpose of the Double Jeopardy Clause was to protect the integrity of a final judgment." *United States v. Scott, supra*, 437 U.S. at 82, 87, 98 S.Ct. at 2192, 57 L.Ed.2d at 72, 74. Thus, "a provision like that of double jeopardy ... is rooted in history and is not an evolving concept like that of due process." *Gore v. United States*, 357 U.S. 386, 392, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958).

Appellant seeks to buttress his argument by relying upon Mr. Justice POMEROY's Opinion in Support of Affirmance in *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918 (1978). *Potter* was affirmed per curiam by an equally divided court. Mr. Justice POMEROY wrote that *the same double jeopardy considerations that apply to mistrials caused by prosecutorial misconduct should also apply to the double jeopardy analysis where the defendant's appeal has won for him a new trial due to prosecutorial misconduct.* He based his view on his belief that "the applicability of double jeopardy analysis is not dependent on nice procedural distinctions." *Id.*, 478 Pa. at 259, 386 A.2d at 921.

However, as we have previously mentioned, mistrials present a distinctly different consideration because the right of the accused to have judgment passed upon by the empanelled tribunal has been

This distinction is much more than a quibble over the appropriate analysis to address a specific wrong. Because double jeopardy has at its heart the concept of finality, the remedy for a violation thereof precludes further prosecution. On the other hand, where the asserted error relates to the fairness of the initial proceeding, in most instances, adequate relief can be given by providing the opportunity for a second trial free of that error. Here we are concerned with trial error which affected the fairness of the trial. Appellant received the full remedy to which he was entitled when he was awarded a new trial. The Opinion in Support of Reversal's gratuitous grant of the greater remedy of discharge is not necessitated by the nature of the harm and abandons the societal interest in just determination in criminal matters.

Therefore, I would affirm the order of the lower court denying appellant's motion to dismiss.

## OPINION IN SUPPORT OF AFFIRMANCE

KAUFFMAN, Justice.

The Opinion in Support of Reversal implies that the Commonwealth resorted to prejudicial and inflammatory

frustrated. Such is not the case where the verdict has been rendered and is set aside at the behest of the defendant upon a finding of trial error. The very core of the protection offered by the double jeopardy clause is the assurance of an adjudication by a tribunal having jurisdiction to hear and determine the cause and the finality of that judgment. *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916). Thus, mistrials touch upon the very heart of the double jeopardy protection since, in those cases, the original tribunal is prevented from passing judgment.

After the tribunal has reached a verdict an altogether different situation is presented when the defendant appeals his conviction and seeks a new trial. In those circumstances it is clear that "[t]he successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, . . . poses no bar to further prosecution on the same charge." *United States v. Scott, supra*, 437 U.S. at 90, 98 S.Ct. at 2193, 57 L.Ed.2d at 74. In sum, the distinction between a mistrial and a retrial following a successful appeal is more than mere procedure. Instead, it is rooted in the historical purposes of the double jeopardy clause.

tactics in order to compensate for deficiencies in what was otherwise a vague, weak circumstantial case. Nothing could be further from the truth. On direct appeal of the original jury verdict, *Commonwealth v. Hoskins*, 485 Pa. 542, 403 A.2d 521 (1979), we carefully reviewed the prosecution's circumstantial evidence and unequivocally held it sufficient to sustain a conviction for murder of the first degree. The Opinion in Support of Reversal reveals but a fraction of that evidence.

That the prosecutor employed improper tactics is unquestionable; indeed, that was the very reason we held that a mistrial was appropriate. Although appellant certainly is entitled to a new trial, he is not entitled to a *discharge* unless the mistrial were deliberately provoked or the prosecutor acted in bad faith. *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980). There is no accusation here of deliberate provocation and under all the circumstances of this case, I do not believe that bad faith has been shown.

Accordingly, I would affirm the order below.

## OPINION IN SUPPORT OF REVERSAL

ROBERTS, Justice.

At appellant William Hoskins' jury trial, the prosecuting attorney over defense objection repeatedly questioned both appellant's alibi witness and appellant himself on wholly irrelevant, inflammatory matters, frequently in deliberate disregard of rulings of the trial court. An example of the objectionable misconduct is the following question, put to appellant: "And you know that Robert Blair [(common-law husband of appellant's alibi witness)] is in the drug business, don't you? Don't you?" This Court held that appellant's request for a mistrial immediately following this improper question should have been granted because of the prosecutor's misconduct. 485 Pa. 542, 403 A.2d 521 (1979). Speaking for the Court, Chief Justice Eagen concluded:

"The 'atmosphere of the trial' was such that the 'unavoidable effect' of the improper and inflammatory leading

question pertaining to Blair's drug activities was to form in the minds of the jury bias and hostility toward Hoskins and thus prevent an objective verdict."

485 Pa. at 556, 403 A.2d at 528, quoting *Commonwealth v. Stoltzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975).

This is an appeal pursuant to *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977), from an order of the Court of Common Pleas of Philadelphia denying appellant's pre-retrial motion to dismiss indictments on the ground of double jeopardy. At issue is whether the prosecutorial misconduct at appellant's jury trial constituted "overreaching" which bars appellant's retrial. The present record is clear that the prosecutor, who not only sought to inject irrelevant, inflammatory matters into the trial but also, on more than one occasion, deliberately ignored rulings of the trial court, engaged in overreaching. Hence the order must be reversed.

## I

Appellant is charged with criminal homicide, conspiracy, and various firearms offenses. The alleged homicide occurred on November 5, 1975, at approximately 12:30 p. m., in the 8600 block of Bayard Street, Philadelphia. The victim, Herchell Williams, was shot several times and killed by two men shortly after leaving his home.

Police arrived at the scene shortly after the killing. Based on interviews with a neighbor of the victim and a friend of the neighbor, police issued a radio broadcast containing a description of a green Cadillac and "suspicious" persons seen in the neighborhood moments before the shooting. Appellant and two companions, Lonnie Dawson and Joseph Rhone, were stopped approximately one-half hour later, at about 1:15 p. m. while riding on the Schuylkill Expressway, in a green Cadillac belonging to appellant's employer, Calvin Tilghman.

Appellant and his companions were returned to the scene of the shooting. The record, however, contains no indication that persons in the neighborhood could identify either appel-

lant or the two other suspects. The Commonwealth nonetheless proceeded against appellant on the theory that appellant was one of the two men who had fired the fatal shots.

Although a Philadelphia police officer had obtained inculpatory statements from appellant, appellant successfully moved before trial to suppress the inculpatory statements on the ground that the police officer had beaten appellant at the time the statements were obtained. The Commonwealth did not challenge the suppression court's ruling. See *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963).

At trial, the Commonwealth's sole eyewitness did not implicate appellant. The eyewitness testified only that two men, coming from different directions on Bayard Street, approached the victim and "just started shooting on him." Thus the Commonwealth's case-in-chief was based solely upon circumstantial evidence.

Frederick Robb, resident of Bayard Street, and Daniel Parks, friend of Robb, testified for the Commonwealth that appellant was standing on or near Bayard Street within moments of the shooting. On cross-examination, however, this circumstantial evidence was substantially weakened. Most significantly, defense counsel established that, when police had returned to the scene on the afternoon of the shooting with appellant, neither Robb nor Parks had identified appellant as one of the "suspicious" men they had previously seen. Also identifying appellant at trial was Nazie Cook, a neighborhood resident, who testified that, about 12:15 p. m. of the day of the shooting, she encountered appellant driving a green Cadillac with two other occupants. However, while previous Commonwealth witnesses had consistently testified that appellant had been wearing an unusual hat, Cook on cross-examination had no such recollection.

After appellant had unsuccessfully demurred to the Commonwealth's circumstantial evidence, appellant proceeded to present the alibi that he was in a different part of the city at the time of the shooting. Testifying on appellant's behalf was Rene Williams, sister of the victim. Williams main-

tained that she had seen appellant in front of the "Unusual Gift Store" at 41 S. 40th Street at "12:15, 12:20, 12:25 the latest." According to Williams, appellant assisted her in delivering a package of silver coins to the gift store. Williams added that she was "very close" to her brother.

The prosecutor's misconduct began on cross-examination of Williams. The prosecutor engaged in a wide-ranging inquiry prompting numerous defense objections, several of which were sustained by the trial court. Included among those inquiries to which the court sustained defense objections were questions relating to (1) the alleged refusal of the witness's mother to visit the district attorney's office, (2) the witness's membership in the "Nation of Islam," (3) the witness's alleged awareness that, prior to her brother's death, "the Muslims" were looking for her brother, and (4) the status of Lonnie Dawson, appellant's companion, as president of "Black Incorporated."

Additionally, the prosecutor unfairly criticized the witness's version of why she arrived at the Unusual Gift Store when she said she did. The prosecutor and Williams had engaged in the following exchange:

"Q. You could remember that this happened about 12:15 or thereabouts; is that right?

A. I told you I'd been there at 12:00 o'clock. I was running late. It was a bad time of the month. I wasn't feeling well. I was running late. I had to be back for my son by 1:00, and I was saying to my daughter, 'I'll be running late.' I was fifteen or twenty minutes late, or something like that.

Q. You don't know what time it was, then, do you?

A. I was due there at 12:00. I know I was fifteen or twenty minutes late.

Q. What did you do that morning?

A. That whole morning?

Q. Yes.

A. I was in home—at home in bed that morning.

Q. You were what?

   A.   I was home.  It was a bad time of the month for me. I wasn't feeling good.  I was home."

Gratuitously and prejudicially, the prosecutor then stated: "Do you mean to tell me it was a bad time of the month because you have no one to corroborate the fact that you were home that morning; isn't that right?  That's why it was a bad time of the month."

Defense counsel's immediate objection was sustained.

The prosecutor also improperly returned his inquiry to questions relating to the witness's mother despite the fact that the trial court had previously sustained defense objection to this line of questioning.  The following exchange, including a rebuke from the trial court, appears:

"Q.  Where is your mother now, by the way?

MR. DENKER [(defense counsel)]:  Objection to the relevancy.

THE COURT:  If she knows.

MR. DE SIMONE [(prosecutor)]:  If she knows.  It will be relevant, Judge.

THE COURT:  All right.  You will have to make it relevant.

A.  At this moment I do not know.

Q.  Where is she living?

A.  (Pause)

Q.  Is that a difficult question where your mother lives?

MR. DENKER:  Obviously, Your Honor—

THE COURT:  Yes.  Counsel, just ask the question. Don't make comments.

A.  3518 North 23rd.

Q.  And your father?

A.  Atlantic City.  130 Atlantic Avenue.

Q.  Now, your mother is not selling drugs now, is she?

MR. DENKER:  Now, Your Honor—

THE COURT:  Objection sustained.

MR. DENKER:  Your Honor, this goes to—what kind of a question is that?

THE COURT: Objection sustained, counsel.

Q. How about you?

A. My mother worked every day. She's always worked. She's never sold drugs.

Q. She loved her son, didn't she?

A. She gave birth to him.

Q. She won't come down here in court; isn't that right?

MR. DENKER: Objection. How does she know?

THE COURT: Mr. DeSimone, I've already sustained an objection to that line of questioning.

Q. This is the trial for your—

MR. DENKER: What is this, Your Honor?

Q. This is the trial for the death of your brother; isn't that right?

MR. DENKER: Your Honor, I object to this tactic.

THE COURT: I haven't heard the question.

Q. Isn't that right? Your brother got killed; isn't that right? This is the trial for him.

A. Yeah.

Q. Where are the members of your family?

MR. DENKER: What has that got to do with this case?

THE COURT: Just a moment.

MR. DENKER: Objection.

THE COURT: Objection sustained."

The prosecutor's misconduct in questioning Williams continued even after redirect examination. On redirect of Williams, defense counsel had sought to clarify that Williams had not seen Elaine Vinyard, proprietor of the Unusual Gift Store, when Williams had dropped off the package of coins. On re-cross, however, the prosecutor ignored the narrow scope of this redirect testimony and asked:

"Q. Ma'am, are you aware that Elaine Vinyard posted bail for Roy Hoskins? Are you aware of that since you are close to Elaine Vinyard? You do have business dealings with her.

MR. DENKER: Objection.

THE COURT: Objection sustained.

MR. DENKER: I move that it be stricken.

THE COURT: Objection sustained. Counsel, she said she didn't see Elaine Vinyard with Mr. Hoskins on the date of the incident.

Q. She owns—Elaine Vinyard owns the Unusual Gifts Shop; isn't that right?

Why are you looking over there for?

MR. DENKER: I object.

THE COURT: Yes.

MR. DENKER: I object.

THE COURT: Objection sustained. Just ask the question."

Appellant then testified on his own behalf. Appellant stated that, on the day in question, he went to the Unusual Gift Store at about 11:30 a. m. Appellant claimed that he was interested in seeing the owner, Elaine Vinyard, about opening a similar store featuring certain telephones sold at the gift store. According to appellant, however, Vinyard was not at the store. Appellant testified that, as he waited for Vinyard, Williams arrived at the gift store at about 12:15 p. m., leaving a package with appellant. Appellant additionally claimed that Lonnie Dawson, one of the persons arrested along with appellant, appeared at the store driving the Cadillac owned by Tilghman, in which he, appellant, and Rhone were eventually stopped. Appellant stated that he asked Dawson to take him home. According to appellant, Dawson agreed and the two left. After a brief stop to visit a friend of Dawson's, they proceeded to appellant's house by way of the expressway. There, appellant was stopped and taken into police custody.

Appellant stated that he had known the victim, for "[a]bout three, four years" on a social basis, but added that he had no business dealings with him and did not know whether the victim had been involved in drug traffic. Appellant testified that he, as well as several other people, had driven Tilghman's Cadillac, as he and Dawson worked for

Tilghman as sales clerks. Appellant denied that he knew the victim's religious beliefs. He also denied being on Bayard Street, except when taken there by police after his arrest.

As with the previous defense witness, the prosecutor pursued several lines of inquiry which prompted defense objection. The prosecutor began his cross-examination by asking appellant if he was a Muslim, affiliated with the "Temple Twelve." The court overruled defense counsel's objection on the basis of the prosecutor's assertion that appellant's religious affiliation was relevant. The court, however, directed defense counsel to renew the motion if the prosecutor did not subsequently establish relevancy. Even though he continued with this line of questioning and obtained an affirmative answer from appellant, the prosecutor made no effort to establish the relevancy of appellant's religious affiliation.

The prosecutor then asked appellant the questions concerning Robert Blair, alleged common-law husband of alibi witness Rene Williams, which formed the basis for this Court's holding on direct appeal that a mistrial should have been granted. The following exchange occurred:

"Q. And you know that Robert Blair is in the drug business, don't you? Don't you?

A. No, I don't.

MR. DENKER: Objection.

THE COURT: Yes.

MR. DENKER: I move that be stricken and move for a mistrial.

THE COURT: Objection sustained.

MR. DE SIMONE: Judge—

MR. DENKER: I move for a mistrial.

THE COURT: Objection sustained. It shall be stricken. The jury will disregard it."

The prosecutorial misconduct continued as the prosecutor sought to inject the fact that appellant's boyhood friend, the son of appellant's employer Calvin Tilghman, had been killed. After confirming that the son had been a good

friend of appellant's, the prosecutor, on cross-examination, told appellant, "Tell the jury what happened to him, your good friend." Defense counsel immediately objected, stating that the matter was wholly irrelevant. The court sustained the defense objection. Nonetheless, the prosecutor persisted with the irrelevant matter. This exchange followed:

"MR. DE SIMONE: Well, Judge, it is relevant.

THE COURT: It is sustained.

Q. Well, he was killed, wasn't he?

MR. DENKER: Objection.

THE COURT: Who? I don't know who 'he' is.

Q. Calvin Tilghman's son was killed.

THE COURT: Objection sustained to the question.

MR. DE SIMONE: Judge—

THE COURT: The jury will disregard it. We are trying one case.

MR. DE SIMONE: We are, judge. It might be relevant as to why Calvin Tilghman's son was killed.

THE COURT: When I sustain an objection you will not ask other questions in that area."

## II

There can be no question that this record reveals an alarming level of prosecutorial misconduct. Throughout cross-examination of appellant's alibi witness, the victim's sister, as well as the cross-examination of appellant, the prosecutor continually sought to direct the jury's attention to inflammatory matters wholly irrelevant to the Commonwealth's cause. At times the prosecutor did so despite specific rulings of the trial court previously forbidding inquiry into the areas pursued.

Such persistent misconduct is especially troubling, for it should have been clear to the prosecutor that such misconduct has no place in the courtroom. "In advocating the cause for this Commonwealth, prosecutors are to seek justice, not only convictions." *Commonwealth v. Cherry*, 474

Pa. 295, 301, 378 A.2d 800, 803 (1977). See also American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function § 1.1 (Approved Draft, 1971); Pa. S.Ct. Code of Professional Responsibility EC 7–13 (1974). As the Supreme Court of the United States long ago made clear,

> "[a prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Accord, *Gannett Co. v. De Pasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

The consequences of a prosecutor's misconduct are many. Where, as here, prosecutorial misconduct has caused one trial to be set aside, there is a needless strain on already scarce professional and judicial resources. It is equally evident that swift and certain enforcement of the law had been frustrated.

Moreover, because appellant's jury trial was set aside as a result of prosecutorial misconduct, there is implicated the basic mandate of our system of criminal justice that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. Accord, Pa.Const., art. I, § 10; *Commonwealth v. Campana*, 455 Pa. 622, 314 A.2d 854 (1974). The Supreme Court frequently has explained:

> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individu-

al for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223 (1957). Accord, *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

Although it is generally true that the double jeopardy clause will not bar retrial where a defendant obtains a new trial by way of a request for a mistrial, see, e. g., *United States v. DiFrancesco,* supra, and *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 52 L.Ed.2d 80 (1977), retrial will be barred where the defense requests a mistrial and obtains relief as a result of prosecutorial "overreaching." Recently, in *Commonwealth v. Starks,* this Court identified those circumstances in which there exists prosecutorial "overreaching" barring retrial:

"The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. See *United States v. Dinitz,* [424 U.S. 600, 611, 96 S.Ct. 1075, 1081 (1976)]. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. See *Lee v. United States,* supra at 32, 97 S.Ct. at 2147; *United States v. Dinitz,* supra at 611, 96 S.Ct. at 1081–82. In contract to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against."

490 Pa. 336, 341, 416 A.2d 498, 501 (1980).

Here a record of overreaching is manifest. Apart from the sheer volume of instances where on cross-examination

the prosecutor, in the words of the Supreme Court, "struck foul blows," it is evident that, at the time of the repeated misconduct, the Commonwealth's case was quite fragile. Even before the accused sought to present his alibi defense, supported by the sister of the victim, the Commonwealth's case had already been weakened by both the suppression of statements obtained while appellant was beaten by a police officer and the inability of the Commonwealth's sole eyewitness to identify appellant. The circumstantial proof which remained, primarily resting on the testimony of three persons placing appellant at or near the scene before the killing, had been undermined by defense counsel's cross-examination pointing out serious flaws in the Commonwealth witnesses' identification testimony. Faced with this fragile case, the prosecutor's response was to engage in repeated acts of misconduct. This misconduct included gratuitous and prejudicial remarks in questioning the victim's sister. It included an inquiry concerning the accused's religious affiliation which, despite his representations of relevancy, the prosecutor never sought to justify. Most revealing, the misconduct also included attempts to repeat questions to which the trial court had already sustained defense objection.

With unmistakable clarity, the prosecutorial misconduct here signals, in the words of *Starks*, "the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against." On this record the defense request for a mistrial falls outside the general rule that retrial.is not barred where a defendant obtains a new trial by way of a mistrial request. See *United States v. DiFrancesco*, supra, and *United States v. Dinitz*, supra. The sole remedy for the intolerable level of misconduct demonstrated on this record is to direct dismissal of the indictments.

O'BRIEN, C. J., and FLAHERTY, J., join this Opinion in Support of Reversal.