442 A.2d 746

**COMMONWEALTH of Pennsylvania**

v.

**Ernest C. CUSTOR, Appellant.**

Superior Court of Pennsylvania.

Submitted March 4, 1981.

Filed March 5, 1982.

236

Michael J. Weintraub, Trenton, N. J., for appellant.

Michael Kane, District Attorney, Doylestown, for Commonwealth, appellee.

Before CERCONE, President Judge, and WICKERSHAM and BROSKY, JJ.

CERCONE, President Judge:

The sole question presented in this appeal is whether the prosecutorial misconduct which caused a mistrial in the court below amounted to "overreaching" and consequently precludes appellant's retrial on grounds of double jeopardy. We conclude that it does not, and, therefore, affirm the order of the court below.

On April 24, 1976, Dennis Carson was operating his automobile in a southerly direction on Route 1, Bucks County, Pennsylvania. He was accompanied by a passenger, Albert Falls. As Carson was proceeding in the passing lane, he noticed a motorcycle in the passing lane on the northbound side of the road. As the vehicles approached each other, the motorcycle swung out onto the southbound side of the road in order to pass another vehicle in the northbound passing lane. Since the motorcycle was now in the path of Carson's vehicle, Carson was forced to swerve to the right in order to avoid a collision. The appellant, however, testified that it was Carson who swerved into his path requiring him to take evasive action. In any event, the collision was avoided and Carson proceeded to a traffic light at which he came to a stop because the light had turned red in his direction. While he was stopped, the motorcycle he had previously observed going northbound now approached southbound from his rear. The motorcycle passed Carson and stopped two or three feet directly in front of Carson's automobile. Appellant was the operator of the motorcycle with a young lady passenger on the rear seat. After he stopped the motorcycle, appellant dismounted, ran toward Carson's automobile, and pulled a large hunting knife from a sheath under his jacket. As he approached the driver's door, appellant reached into the car with the hunting knife and stabbed Carson in the lower part of the throat. Carson held appellant's arm in order to fend off further blows which appellant was attempting to inflict. When he felt himself getting

weaker, Carson exited the automobile from the passenger side door and ran to a diner located on the opposite side of the road. He collapsed in the doorway.

In the meantime, Carson's passenger had also exited the automobile and was pursued by appellant still brandishing the knife. The passenger ran toward a fast food store near the intersection and, when he turned to defend himself, he found that appellant had discontinued the pursuit. Appellant returned to his motorcycle, but could not get the motor to start. At that point, a police officer arrived and ultimately arrested appellant after discovering what had transpired.

There were four independent eyewitnesses to the foregoing incident. At trial, appellant did not deny his involvement, but rather testified that he could recall nothing from the time he stepped off his motorcycle to the time the police had arrived. The appellant's defense was, therefore, geared to establish his intoxication at the time of the incident, his loss of memory, and his history of alcoholism. This was all offered to buttress his defense of temporary insanity.[1] The jury, nevertheless, found appellant guilty of criminal attempt to commit murder,[2] simple assault,[3] aggravated assault,[4] recklessly endangering another person,[5] and prohibited offensive weapons.[6]

Upon the filing of post-verdict motions, however, the lower court granted appellant a new trial due to the prosecuting attorney's relentless inquiries and statements with respect to appellant's membership in the infamous Breed

---

1.  The instant case is an appeal from appellant's second trial at which this evidence was allowed. A new trial had previously been ordered pursuant to post-verdict motions because the court below would not allow such evidence to be admitted in appellant's initial trial.

2.  Crimes Code, 18 Pa.C.S. § 901.

3.  *Id.* at § 2701.

4.  *Id.* at § 2702.

5.  *Id.* at § 2705.

6.  *Id.* at § 908.

Motorcycle Club—a group of dubious reputation.  Appellant now claims that double jeopardy bars his retrial because the misconduct in question allegedly amounts to "prosecutorial overreaching." [7]

It is our opinion that the lower court's award of a new trial adequately protects appellant from the prejudice he encountered due to the prosecutor's overzealous and misguided conduct.  Although a prosecuting attorney has a duty, as representative of this Commonwealth, to seek justice, not convictions, we are unfortunately faced at various times with situations in which the frailties of human nature overcome the judicious sensibilities of the Commonwealth's attorney.  In such cases, the prosecutor's myopic view of justice has disturbed the requisite impartiality of a judicial proceeding to the prejudice of the defendant.  Our usual practice under these circumstances, and the one followed by the lower court in the instant case, is to grant the defendant a new day in court in order to protect his right to a fair and impartial trial.  Normally, by voluntarily requesting a mistrial or a new trial, the defendant is deemed to have waived his constitutional right against twice being placed in jeopardy of life or limb for the same alleged offense.  Comment, *The Double Jeopardy Clause and Mistrials Granted on Defendant's Motion:  What Kind of Prosecutorial Misconduct Precludes Reprosecution?*, 18 Duq.L.Rev. 103, 104–105 (1979).  Nevertheless, reprosecution may be barred where the conduct involved amounts to governmental overreaching.  *Id.*  In *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977), Justice Roberts in a plurality opinion defined overreaching as either intentional or grossly negligent conduct on the part of the prosecution.  This articulation of the standard for determining when retrial is barred, however, was short-lived.  One year after the *Bolden* decision, an equally divided membership of the Supreme Court of Pennsylvania decided *Commonwealth v. Potter*, 478 Pa. 251, 386 A.2d 918 (1978).  In *Potter*, the Court, per Justice Pomeroy, noted

7.  Before appellant's third trial was to begin, he filed a pretrial motion to dismiss the charges against him on grounds of double jeopardy.

that the *Bolden* standard only reflected the view espoused by Justices Roberts [8] and Manderino, and, moreover, that the language contained in *Bolden* was technically dictum as being merely gratuitous in terms of the holding of that case. Justice Pomeroy interpreted the case of *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) not as advocating a grossly negligent test as Justice Roberts opined, but rather as requiring intentional conduct on the part of the prosecution which is either undertaken to provoke a mistrial so as to afford the Commonwealth another perhaps more favorable opportunity to prosecute the defendant or that which is undertaken in bad faith in order to harass or prejudice the defendant. 478 Pa. at 263–65, 386 A.2d at 923–25. Although neither of these cases are dispositive of the question due to their lack of a clear majority, the latter view taken by Justice Pomeroy has been borne out by the recent cases of *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980) and *Commonwealth v. Lee*, 490 Pa. 346, 416 A.2d 503 (1980). *See also Commonwealth v. Smith*, 284 Pa.Superior Ct. 60, 425 A.2d 393 (1981); *Commonwealth v. Thomas*, 270 Pa.Superior Ct. 375, 411 A.2d 767 (1979).[9]  In

**8.** In *Potter*, Justice Roberts authored the opinion in support of reversal in which he advocated adoption of the gross negligence standard:

I find totally unpersuasive the reasons offered by the Opinion of Mr. Justice Pomeroy that an intentional misconduct standard protects the right of an accused not to be placed twice in jeopardy. Moreover, the Opinion of Mr. Justice Pomeroy ignores the public. interest in the prompt and proper resolution of criminal litigation. The important public interest in vindicating its criminal laws in one trial can better be served if the inquiry in such cases focuses on whether the misconduct of the prosecuting attorney was grossly negligent. The grossly improper prosecutorial misconduct in appellant's second trial, as in the previous trial, in no way advanced the Commonwealth's interest in affording appellant a fair trial. Instead, that gross misconduct unjustifiably caused the reversal of appellant's second trial, and all the attendant delays, burdens and unnecessary expenditures of judicial, professional, and public resources. I would discharge appellant because of the gross negligence of the prosecuting attorney in appellant's second trial. 478 Pa. at 277, 386 A.2d at 931.

**9.** Our United States Court of Appeals for the Third Circuit has also recently rejected a gross negligence standard. *See U. S. v. Leppo*,

*Starks,* a majority of the Supreme Court, per Justice Roberts, stated:

> The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. See *United States v. Dinitz,* supra at 611, 96 S.Ct. at 1081. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. See *Lee v. United States,* supra [432 U.S. 23] at 32, 97 S.Ct. [2141] at 2147 [52 L.Ed.2d 80]; *United States v. Dinitz,* supra at 611, 96 S.Ct. at 1081–82. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

490 Pa. at 341, 416 A.2d at 500.

In that case, it was concluded that there was no overreaching because "the prosecutor's statements themselves simply do not suggest a bad faith effort to prejudice or an intent to provoke mistrial." *Id.,* 490 Pa. at 343, 416 A.2d at 501. Similarly, Justice (now Chief Justice) O'Brien held in *Lee* :

> Appellant argues that his retrial should have been barred because the prosecutor in the aborted first trial engaged in either intentional or grossly negligent misconduct by referring to Crawford's having taken a polygraph examination. The test to be applied is whether the Commonwealth engaged in either intentional or bad faith "overreaching." *Commonwealth v. Starks,* 490 Pa. 336, 416 A.2d 498 (1980). In our view, references to a polygraph examination in the instant case does not rise to either level of overreaching. Instantly, the prosecutor, in the heat of legal argument and responding to a question

641 F.2d 149 (3d Cir. 1981). *But see U. S. v. Charette,* 625 F.2d 57 (5th Cir. 1980).

from the Court, informed the Court that the witness in question had taken a polygraph examination. The trial court recognized this misconduct as error and granted appellant a mistrial. In our view, however, this type of prosecutorial misconduct, although erroneous, does not require the extreme sanction of barring retrial of appellant. Appellant's argument is thus without merit.

490 Pa. at 350, 316 A.2d at 505.

Thus, it appears that Justice Pomeroy's view, as expressed in *Potter*, prevails.

Finally, the Supreme Court's most recent pronouncements on the subject illustrate the application of their newly clarified standard. *See Commonwealth v. Virtu*, 495 Pa. 59, 432 A.2d 198 (1981); *Commonwealth v. Hoskins*, 494 Pa. 600, 432 A.2d 149 (1981). In *Hoskins*, the Court was evenly divided on the issue of whether there was sufficient evidence of intentional prosecutorial misconduct to bar retrial. The prosecutor therein engaged in a persistent course of misconduct in questioning witnesses concerning improper, irrelevant and prejudicial matters even after the trial judge had sustained defense objections to those exact or similar inquiries. In his opinion in support of affirmance, former Justice Kauffman stated:

That the prosecutor employed improper tactics is unquestionable; indeed, that was the very reason we held that a mistrial was appropriate. Although appellant certainly is entitled to a new trial, he is not entitled to a *discharge* unless the mistrial were deliberately provoked or the prosecutor acted in bad faith. *Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980). There is no accusation here of deliberate provocation and under all the circumstances of this case, I do not believe that bad faith has been shown.

494 Pa. at 604, 432 A.2d at 152.

On the other hand, Justice Roberts, in his opinion in support of reversal, was of the opinion the Commonwealth had a fragile case which prompted the prosecutor's undertaking to

engage in repeated acts of misconduct. He, therefore, concluded:

> With unmistakable clarity, the prosecutorial misconduct here signals, in the words of *Starks*, "the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against." On the record the defense request for a mistrial falls outside the general rule that retrial is not barred where a defendant obtains a new trial by way of a mistrial request. See *United States v. DiFrancesco*, supra [449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328] and *United States v. Dinitz*, supra. The sole remedy for the intolerable level of misconduct demonstrated on this record is to direct dismissal of the indictments.

*Id.*, 494 Pa. at 615, 432 A.2d at 157.

The *Hoskins* decision, therefore, does not represent a dispute with respect to the standard to be applied in a double jeopardy situation,[10] but rather represents a difference of opinion as to the application of the intentional misconduct standard to a given set of facts.

Likewise, in *Virtu*, the application of the standard was at issue. Apparently, it is the first case in Pennsylvania history to bar retrial due to prosecutorial overreaching. Writing for the majority therein, former Justice Kauffman held that the bad faith part of the *Starks* standard had been met:

> Rather than evidencing innocent error or good faith, however, the prosecutor's actions in the proceedings below appear to have been directed precisely to avoid resolution of the Fifth Amendment questions outside of the presence of the jury. The only plausible explanation for his behavior, is that the difficulty of eliciting crucial testimony, in

10. The opinion in support of reversal, penned by Justice Roberts, quotes the language from *Commonwealth v. Starks* requiring misconduct which is either intended to provoke a mistrial or undertaken in bad faith to prejudice or harass the defendant. Justice Roberts then concluded that the course of conduct taken by the prosecution in *Hoskins* was of the kind which the double jeopardy clause was intended to proscribe.

consequence of the witness' anticipated assertion of his privilege against self-incrimination, led [the prosecution] to attempt a maneuver designed to prejudice appellant by forcing the witness to assert the privilege in the presence of the jury.

The record here conclusively displays an extraordinary course of prosecutorial overreaching, including direct misrepresentation to the court, taken in deliberate bad faith. This kind of intentional prosecutorial misconduct is a threat to the very integrity of our judicial process, and must not be condoned. *Commonwealth v. Starks, supra,* n. 7.

We are reluctant to mandate dismissal of charges against this or any other defendant in the absence of a completed fact finding procedure. But extraordinary prosecutorial misconduct necessitates commensurately strong sanction. If protection against double jeopardy is to have any meaning at all, it must be invoked when an initial trial has been aborted as a result of a bad faith strategy pursued by the prosecution in a deliberate effort to prejudice the accused in the presence of the jury. Thus, the Commonwealth is now precluded by constitutional restraints against double jeopardy from seeking a second opportunity to obtain a conviction of this defendant.

495 Pa. at 69, 432 A.2d at 203–204.

Indicating his disagreement, Justice Larsen penned a dissenting opinion in which he took the position that a deliberate bad faith attempt to prejudice or harass the defendant had not been shown:

To rule that a single instance of prosecutorial misconduct, as we have here, rises to the level of bad faith/harassment type overreaching, especially in the absence of a finding of bad faith by the lower court, in effect elevates all non-inadvertent prosecutorial misconduct to *Dinitz* overreaching status, since virtually *all* prosecutorial trial tactics are designed to prejudice the ac-

cused's prospects for acquittal. Every deliberate act which was later determined to be prosecutorial misconduct would thus entitle the defendant to discharge.

*Id.,* 495 Pa. at 72, 432 A.2d at 205 (Larsen, J., dissenting). Thus, in *Virtu,* a majority of our Supreme Court has indicated that the double jeopardy standard for prosecutorial overreaching is something more than mere hollow pretense.

In a broader view, these two cases illustrate the problems associated with the application of any standard which delves into the mental state of the prosecutor. *See* Comment, *The Double Jeopardy Clause and Mistrials Granted on Defendant's Motion: What Kind of Prosecutorial Misconduct Precludes Reprosecution?,* 18 Duq.L.Rev. 103, 110 (1978) ("establishing the requisite mental state of the prosecutor is an awesome burden, if not an insuperable one, in the absence of an express declaration by the prosecutor that he is engaging in the activity for the explicit purpose of provoking a mistrial request" [11] ). This is not to say that such a standard is, therefore, unworkable for the *Virtu* decision is an indication to the contrary. *See also* note 11, *supra.* Rather, it is a situation where the courts must exercise sound discretion in determining when a finding of intentional misconduct is appropriate. As always, such discretion is best exercised by the trial judge who can observe the pertinent conduct and demeanor of the prosecutor to determine his motivations, or lack thereof, better than we can on a cold record. *See Commonwealth v. Wright,* 439 Pa. 198, 266 A.2d 651 (1970).

The record in the instant case evidences improper conduct by the prosecutor in continually attempting to elicit testimony regarding appellant's membership in the notorious Breed Motorcycle Club. Initially, the prosecutor's questions went to appellant's general attire at the time of the incident. From this rather innocuous line of questioning, the prosecutor went into more and more detail about the colors and

11. The author notes that this is also a problem with adopting a gross negligence standard: "any inquiry into the mental state of the prosecutor is, of course, a difficult one, and the precise point at which an impropriety becomes gross negligence is difficult to isolate." *Id.* at 131 (footnotes omitted).

emblems exhibited upon appellant's motorcycle jacket which identified him as a member of the Breed Motorcycle Club. At first, defense counsel did not object and, when he eventually did, the objection was summarily overruled. The issue was, nevertheless, put in question at a later time with the following exchange:

Q. Members of the Breed motor cycle gang—motor cycle club—whatever, do they frequent Phil's Bar?

[DEFENSE ATTORNEY]: Objection, Your Honor.

THE COURT: Sustained

[PROSECUTOR]: Are you friends with members of the Breed motor cycle—

[DEFENSE ATTORNEY]: Objection.

THE COURT: Sustained. I will see counsel at sidebar.

．　　．　　．　　．　　．

(Whereupon a sidebar conference was conducted out of the hearing of the jury as follows:)

[DEFENSE ATTORNEY]: Your Honor, I would like to move for a mistrial.

THE COURT: I beg your pardon?

[PROSECUTOR]: If I may lay a foundation, Your Honor, the defense in this case is insanity, that he committed these acts due to an insane state. It is the Commonwealth theory of this case that Mr. Custor was wearing his Breed colors that day. Wearing Breed's colors is something particular. It is in the nature of perhaps members of the armed forces wearing their uniform and that branch being challenged. On that occasion he was wearing Breed's colors and there was an altercation on the highway and it is my intention to build up a case in order to show the Commonwealth's theory that motive in this case was Mr. Custor was, in a way, standing up for his colors. He was acting out as he felt necessary as a member of the Breeds and that is the theory.

With this witness, the reason I am bringing this out, I think to go into anything as far as the witness on why he might be biased or why he might be coming into court with tainted testimony. The fact that Mr. Custor is a

member of the Breeds, the fact that Breed's members associate the bar, frequently associate the bar, could go to either friendship on the part of this witness or Mr. Custor or fear on the part of this witness, and that is why it goes to bias or motive for testifying.

．　　　．　　　．　　　．　　　．

THE COURT: His motive was to do what?

[PROSECUTOR]: You have to know something about the nature of the motor cycle club. I hope to do it when the defendant takes the stand; but as far as the witness is concerned, the important thing is whether or not he might be biased one way or another to shape his testimony.

THE COURT: Well, we will permit you to ask him whether members of the Breed Motor Cycle Club do, in fact, attend that bar and whether because of that fact he is here but I am not going into a trial—I think it would be improper—of the Breed Club. I know what you want to do. I know your reputation.

[PROSECUTOR]: I have some knowledge of violence by some of the Breeds.

THE COURT: But the jury doesn't know that and I don't think because of the members of Breed it necessarily follows that he did what he did today, he did on the 24th.

[PROSECUTOR]: But as far as this witness goes, I think there would be either out of friendship or out of any other motivation.

[DEFENSE COUNSEL]: May I be heard, Your Honor? Your Honor, with all due respect to [Prosecutor], he is reaching for a justification. His sole purpose was to inflame the minds of the jury. Whether or not this gentleman was friendly with the Breed and whether or not Breed might have a motive or the motive might be because of the Breed colors if there was a motive that the Commonwealth wanted to establish, they should have brought that out on the Commonwealth case. I don't have any obligation to call Mr. Custor even though I stated in my opening that I don't want to call him.

THE COURT: I agree with all that; but if the Common-
wealth can attempt to show a motive for dishonesty on
the part of this witness, I would limit it to that.

[DEFENSE COUNSEL]: Your Honor, the only thing that
should be an issue would be whether or not he had a
friendship with the defendant.

[PROSECUTOR]: I just think the rules of evidence let
you go into bias.

THE COURT: Not far afield.

[PROSECUTOR]: Limit it to whether or not members of
the Breed frequented the place and he was on a friendly
basis with him?

THE COURT: Yes, that is all.

[PROSECUTOR]: Okay.

[DEFENSE COUNSEL]: I don't understand what differ-
ence it would make if he was friendly with other members
of the Breed.

[PROSECUTOR]: I am saying if a certain club frequent-
ed a bar and a person is friendly, that could influence the
witness in his testimony either out of reluctance to tell
what actually happened because they frequented his bar
and just want to go against what, you know, their theory
of the case is or that out of friendship for him he will
testify to what they tell him.

[DEFENSE COUNSEL]: That is a fishing expedition.

THE COURT: You can rehabilitate your witness if there
is anything wrong. You can ask him about the fact that
the Breed members attend the bar.

[DEFENSE COUNSEL]: I don't want to bring the Breed
up. He is bringing it up to inflame the jury.

[PROSECUTOR]: That is not the purpose, Your Honor.

THE COURT: To the extent that I have mentioned. The
motion is refused.

(Conclusion of sidebar conference)

Thus, the lower court allowed testimony concerning the fact
that members of the Breed Motorcycle Club frequently

patronized the bar at which the witness was employed as a bartender. This was admitted solely for the limited purpose of impeaching the witness' credibility due to friendship with, and/or fearfulness of, the members of the club. Despite this limitation, the prosecutor continued undauntedly in his misguided attempt to establish the prosecution's theory of motivation:

BY [PROSECUTOR]:

Q. Mr. Custor, on April 24, 1976 you were wearing a motor cycle club jacket?

A. Yes.

Q. And that jacket is a Breed Motor Cycle Club?

A. Yes.

Q. Can you tell us what it means to be wearing the colors?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Sustain the objection. May I see counsel at sidebar, please?

.    .    .    .    .

(Whereupon a sidebar conference was conducted out of the hearing of the jury as follows:)

THE COURT: That case has been tried once. I do not want it to have to be tried a second time by irrelevant matters being brought into this case.

[PROSECUTOR]: It is our contention that it is not irrelevant matters. In this case I think the Court is just being too cautious just due to the fact that the Breed—It is a fact that it is a club and there is something psychological to be wearing the club colors. When you are wearing the club colors, you are not supposed to take any type of grief from anybody on the highway. You're in command on the highway. That is the importance. The defendant is given great leeway in building up the defense.

THE COURT: They should be. If you read the cases, you would understand.

[PROSECUTOR]: But the Commonwealth—

THE COURT: Not the point.

[PROSECUTOR]: If I may, a case that came in—another case we had at lower level. There was a gang rape by Breed members and the evidence was allowed to come in about Breed members and about how they get patches for gang rape, et cetera, and when it is relevant to that case, it is relevant to this case.

THE COURT: What are you going to show if this fellow answers? Are you going to show anything in rebuttal?

[PROSECUTOR]: Mr. Custor was not ready to take any type of grief from anybody on the highway.

THE COURT: How are you going to show that?

[PROSECUTOR]: Through the defendant.

THE COURT: Well, then get to the point.

[PROSECUTOR]: I don't know how he is going to answer the questions of course.

THE COURT: My question was—

[PROSECUTOR]: I will go on. You can rule on it as it comes up. If I feel it is relevant, I will bring it up. I am certainly not using it for the purpose of inflaming. I think it is relevant for the theory of the case, Your Honor.

THE COURT: Well, if you say that one of the precepts of the Breed was not to take any nonsense or insults from anybody on the highway—

[PROSECUTOR]: There is something else, Your Honor. The information we have is that Mr. Custor, although he is a member of the Breed, he is not exactly one of those strong members. It is our theory that Mr. Custor's wearing his Breed uniform was an attempt to build himself up in the community. Along with that statement, I don't see anything wrong with that whole thing. There's psychological factors that should go in now for the cross examination of the psychiatrist.

The psychiatrist comes in with his insanity theory and I want to pose to the psychiatrist other things as far as feelings to show himself to a group. All that stuff has to become relevant when it comes down to insanity as a defense.

[DEFENSE COUNSEL]: That is a fishing expedition.

[PROSECUTOR]: It is not fishing if it's relevant.

[DEFENSE COUNSEL]: You have one purpose and one purpose only in bringing all that out and you know it as well as I do and it is not a fair trial.

.　　.　　.　　.　　.

THE COURT: If you want to ask him whether he belongs to the Breeds; if you want to ask him whether the precepts of the Breed are as you say they are or whether the patches are worn for altercations with people on the highway or whatever you think they are, I will allow that over your objection.

[DEFENSE COUNSEL]: Okay.

THE COURT: But if you are not able by competent evidence to refute him, then you will have to take the consequences of that.

As it developed at trial, the prosecutor was unable to adduce any evidence concerning his theory that, as a member of the Breed Motorcycle Club, the appellant would not "take any type of grief from anybody on the highway." This could not be established through the appellant's testimony as the prosecutor anticipated:

[PROSECUTOR]:

Q. Mr. Custor, is there a particular meaning when you are wearing the colors of the motor cycle club?

A. Shows what bike club you're in.

Q. And do you feel any particular feelings when you are wearing that motor cycle club jacket?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

WITNESS: What feelings should I have? Just pride in your own club.

.　　.　　.　　.　　.

[PROSECUTOR]:

Q. I beg your pardon?

A. It's pride in the club.

Q. In this case it would be pride in the Breed Motor Cycle Club?

A. It's a bike club.

.    .    .    .    .

Q. So, you are angry when someone infringes on your right of way or you believe your right of way?    .
A. I guess you could say so.
Q. And particularly when you are wearing Breed colors because you have a certain pride in your club?
[DEFENSE COUNSEL]: Objection.
THE COURT: Is that a statement or is that a question?
[PROSECUTOR]: It's a question, Your Honor.
THE COURT: Please state that.
[PROSECUTOR]: Don't you have a particular feeling when you are wearing Breed colors and someone infringes on your right of way when you are on the highway on your motor cycle?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
WITNESS: No, sir.

.    .    .    .    .

BY [PROSECUTOR]:
Q. It's no different?
A. It's not different to me.

Nor could the Prosecution's theory concerning appellant's motivation be established through the psychiatrist:

Q. Did Mr. Custor inform you that the day he was riding on his motor cycle he was wearing his motor cycle colors?
[DEFENSE COUNSEL]: Objection, Your Honor.
THE COURT: Overruled.
WITNESS: No. I didn't go into that.

.    .    .    .    .

BY [PROSECUTOR]:
Q. You didn't go into that?
A. About what he was wearing, no I didn't go into what he was wearing.
Q. Did he tell you that he has a feeling of pride when he is wearing those colors?

A. No.

.     .     .     .     .

[PROSECUTOR]: Did you discuss with Mr. Custor his feelings of someone interfering in his right of way when he's wearing motor cycle colors?

A. No.

.     .     .     .     .

[PROSECUTOR]: Did you discuss with Mr. Custor his feelings of someone interfering in his right of way when he's wearing motor cycle colors?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Sustained.

Nevertheless, the prosecutor argued his theory of motivation to the jury in his summation despite having failed to produce any evidence in it's support:

Why did he do it? He told you he's wearing motor cycle colors. He has pride in those colors. He's on the motor cycle. If you look at the motor cycle—suped up motor cycle—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Sustained.

.     .     .     .     .

Well, you can see for yourself the motor cycle in the pictures. Mr. Custor is in command of the highway driving down the road. A person comes into his right of way and almost strikes him. Mr. Custor, in pride for what he stands for, turns around. He's angry; he's upset. He has motivation.

[DEFENSE COUNSEL]: Objection.

THE COURT: I beg your pardon?

[DEFENSE COUNSEL]: Your Honor, that wasn't established at all in the testimony that he was proudly having the right of way on the road or—

THE COURT: Well, let counsel argue. The jury heard the evidence and can determine whether counsel's argument is a valid one or a fallacious one.

.     .     .     .

He turns around and he goes after the individual, and who is that individual? In this case it was a black man. I in no way play up any—see any evidence establishing the argument that racial feelings may have had a point in this case. When the police arrested Mr. Carson, what did he say? "I got myself a nigger." Those are the words he used. Didn't deny saying that statement. Ask yourselves what might have been the motivation on the part of Mr. Custor. Pride in what he stands for on the motor cycle, a person obeying his right or way, a black man doing so? ... Mr. Kelly also gives, as a defense witness putting your best foot forward, testimony about Phil's Place, a place frequented by this motor cycle club.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, may I have a sidebar for a moment?

THE COURT: Yes.

(Whereupon a sidebar conference was held out of the hearing of the jury as follows:)

[DEFENSE COUNSEL]: I would again move for a mistrial based on that statement. Its whole purpose is to inflame the minds of the jury.

THE COURT: Did you hear what he had to say?

[PROSECUTOR]: Yes, Your Honor. It goes to—As I said before when he was testifying, it is going to influence one way or another due to the fact—

THE COURT: I think that is absolutely without a foundation reason. There is nothing in the evidence to show anything wrong with this club.

[PROSECUTOR]: Pardon me?

THE COURT: There is nothing in the evidence at all concerning anything about the club other than the name.

[DEFENSE COUNSEL]: The frequenting of the bar. They use the bar. You wouldn't let me pursue it any further than that if you recall.

THE COURT: Yes, I do recall that. Kelly said that they came in there to drink—members of it. I will overrule the motion but—

[DEFENSE COUNSEL]: I just wanted it on there for the record.

THE COURT: But you are getting close to trouble, [Prosecutor], in your arguments.

[PROSECUTOR]: I don't feel it does, Your Honor.

THE COURT: I am not going to declare a mistrial at this stage. Let us see what happens later.

(Sidebar concluded)

. . . It was a calculated act, a calculated act to get back at a man who invaded his space, a calculated act aimed at a man who challenged him, who questioned his authority on the road, who questioned what he stood for.

After having been granted a new trial at the post-verdict stage, the appellant now contends that this prosecutorial misconduct amounted to overreaching thereby precluding retrial. Through counsel, he alleges that prosecutor's actions were either intentional or grossly negligent. We have previously determined herein that Pennsylvania does not subscribe to the gross negligence standard. *See* discussion, *supra.* Moreover, we agree with the decision of the lower court that the prosecutor's conduct, though ill-advised, was not intentionally designed to cause a mistrial or to prejudice the appellant.

It cannot be justifiably said that the prosecutor intentionally provoked the granting of a new trial so as to secure another more favorable opportunity to convict the appellant. The case against the appellant was overwhelming and the asserted insanity defense was tenuous at best. Under these circumstances, it is highly unlikely that the prosecutor would have deliberately sought to abort the pending proceeding.

Likewise, the prosecutor cannot be charged with having undertaken this strategy in bad faith to prejudice or harass the appellant. Initially, when the prejudicial evidence of appellant's membership in the Breed Motorcycle

Club came into the record, there was no objection. When the appellant's counsel finally did begin to object, the lower court ruled on the objections in a contradictory and inconsistent fashion. At first, this evidence was allowed over objection. Later, this type of evidence was admitted for the limited purpose of impeaching the credibility of a defense witness to show his bias, but not to establish the prosecution's theory of motivation. Still later, the court gave the prosecutor the leeway to establish his theory of motivation after all, despite the total lack of a foundation in the record for it. This was allowed only at the insistence of the prosecutor that he would establish a basis through the appellant himself as well as through the psychiatrist. The lower court then reluctantly allowed him to do so, but warned him that he would have to accept the consequences if he failed to later establish his foundation. Throughout this continuing controversy at trial, the prosecutor vehemently sought to persuade the court that his misguided theory of motivation was a proper one which he was entitled to pursue. In the final analysis, he did so persuade the court, but he, nevertheless, failed to establish the evidentiary basis for his theory. The indecisiveness on the part of the lower court did little to discourage the vigor of the prosecutor on this matter.[12] There is nothing in the record to suggest anything other than that the prosecutor was proceeding under a bona fide belief that his theory was a proper one. He twice expressly disclaimed allegations that he was undertaking this course of conduct to intentionally prejudice or harass the appellant. While the prosecutor's declarations of intent, or lack thereof, are certainly not dispositive, they can properly be considered in the analysis for determining prosecutorial overreaching. Since there is nothing in the record to establish the prosecutor's intent to provoke a new trial or bad faith attempt to harass or prejudice the appel-

12. Even if it were determined that the prosecutor herein acted in reckless disregard of a clear warning by the trial judge, this would still not be enough to establish governmental overreaching. *See Commonwealth v. Thomas*, 270 Pa.Superior Ct. 375, 411 A.2d 767 (1979) (petition for allowance of appeal denied).

lant, there is, therefore, no reason to disturb the lower court's decision that the double jeopardy clause does not bar appellant's retrial in the present case.

Affirmed.